FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
OCTOBER 31, 2024

_González, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
OCTOBER 31, 2024

SARAH R. PENDLETON
ACTING SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | No. 102295-6 |
| | ) | |
| CHARLES SCOTT FRAZIER, | ) | En Banc |
| | ) | |
| Petitioner. | ) | Filed: October 31, 2024 |
| _____ | ) | |

YU, J. — This case asks whether the "newly discovered evidence" exemption from the one-year time limit for collateral attacks, RCW 10.73.100(1), can apply "to new evidence that would likely change a sentencing outcome." *In re Pers. Restraint of Kennedy*, 200 Wn.2d 1, 19, 513 P.3d 769 (2022). We recently indicated that the answer is yes. *Id.* at 19-20; *In re Pers. Restraint of Davis*, 200 Wn.2d 75, 85, 514 P.3d 653 (2022). Today, we reaffirm our prior analysis and expressly hold that the newly discovered evidence exemption can apply to sentencing evidence in appropriate cases.

Nevertheless, RCW 10.73.100(1) imposes a stringent test, as it must, "[g]iven the importance of finality of judgments and sentences." *Kennedy*, 200

Wn.2d at 12. A petitioner seeking to overcome the one-year time limit based on newly discovered evidence faces a high burden. In this case, petitioner Charles Scott Frazier cannot meet his burden on the record presented.

Frazier was convicted of committing murder and arson against his father at the age of 18. He was given a 50-year exceptional sentence in 1989. Nearly 30 years later, Frazier sought resentencing, pointing to "new scientific tools [that have] led to a fundamental shift in the understanding of teenagers' behavioral control and capacity for change." Pet'r's Suppl. Br. at 1. Based on modern "empirical evidence documenting adolescent neurological development," Frazier argues that his personal restraint petition (PRP) is exempt from the 1-year time limit pursuant to RCW 10.73.100(1). *Id.* at 13.

We recognize that the newly discovered evidence exemption can apply to sentencing evidence, including new scientific developments and advances in social scientific research that have become generally accepted in the legal community. However, for purposes of RCW 10.73.100(1), it is not sufficient for a petitioner to merely identify a change in scientific understanding that has occurred since the time of their sentencing. The petitioner must also show they "acted with reasonable diligence in discovering the evidence and filing the petition or motion," and they must satisfy "the five factors for the newly discovered evidence exemption" as set forth in our "existing precedent." RCW 10.73.100(1); *Kennedy,*

200 Wn.2d at 19 (citing *In re Pers. Restraint of Fero*, 190 Wn.2d 1, 15, 409 P.3d 214 (2018) (plurality opinion)).[1]  Frazier cannot do so on the record presented here.

First, Frazier has not met his statutory burden to show reasonable diligence. Modern scientific studies on adolescent neurodevelopment were certainly not available when Frazier was sentenced in 1989.  However, such studies were cited as persuasive authority by the United States Supreme Court as early as 2005, and this court has expressly relied on the same studies since 2015.  *See Roper v. Simmons*, 543 U.S. 551, 574, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *State v. O'Dell*, 183 Wn.2d 680, 691-92, 358 P.3d 359 (2015).  Yet, Frazier did not file his collateral attack until 2018.  Although Frazier points to personal and institutional barriers he faced, he does not describe any reasonably diligent efforts he made to overcome those barriers, discover the new scientific studies, and file his PRP, as required by the plain language of RCW 10.73.100(1).

In addition, Frazier does not satisfy the five-factor test for newly discovered evidence because, on the record presented, he cannot show that modern studies on adolescent neurodevelopment would probably change the result of his sentencing.

---

[1] "To prevail on a claim of newly discovered evidence, a personal restraint petitioner must show evidence that (1) will probably change the result of the trial, (2) was discovered since the trial, (3) could not have been discovered before trial by the exercise of due diligence, (4) is material, and (5) is not merely cumulative or impeaching." *Fero*, 190 Wn.2d at 15.

Frazier correctly points out that when he was sentenced in 1989, the sentencing court erroneously treated his youth as an "aggravating factor." Br. of Pet'r (Wash. Ct. App. No. 52078-8-II (2023)) (COA Br. of Pet'r), App. at 56. However, the only aggravators explicitly connected to Frazier's youth were reversed on direct appeal; they are not the basis for his exceptional sentence.

Instead of his youth, Frazier's exceptional sentence is based on the sentencing court's findings of cruelty and abuse of trust. These findings are well supported by the record, which shows that Frazier poured gasoline on his 65-year-old father, set him on fire, and trapped him in a basement room to prevent him from escaping or seeking help. Frazier argues that "[h]is young age was the underlying reason the court construed his actions as more deliberate and cruel," but there is no sentencing transcript or other evidence in the record to support this view. Pet'r's Suppl. Br. at 29. Therefore, on the record presented, Frazier cannot show that new studies on adolescent brain development would probably result in a different sentence.

Thus, Frazier does not satisfy RCW 10.73.100(1). We affirm the Court of Appeals' dismissal of his PRP as time barred.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A.    Frazier's convictions, sentencing, and direct appeal

According to the Department of Corrections' presentence and intake report,

Frazier and his adoptive father "had a confrontation" in November 1986, about one week after Frazier turned 18. COA Br. of Pet'r, App. at 36. His father "had threatened to kick Charles Frazier out of the family residence due to his inability to follow the house rules." *Id.*

Four days later, there was a fire in the basement of the family home, where Frazier's father, "approximately 65 years of age, was found deceased on the bed." *Id.* There were two gasoline cans next to the bed, and Frazier reportedly "boasted" to multiple people "that he had killed his father by burning him with gasoline." *Id.* Frazier's version of the offense was "that his father chose to commit suicide by fire" and that his statements about killing his father with gasoline "were not the truth." *Id.* at 37.

Following a jury trial in 1989, Frazier was convicted of first degree murder and first degree arson. The presentence investigation report recommended a sentence at the top of the standard range, but did "not address the issue of an exceptional sentence." *Id.* at 39. However, the State requested an exceptional sentence above the standard range, alleging two aggravating circumstances: (1) that Frazier "violated a position of trust" because his father had taken Frazier "back into the home after having been released from juvenile facilities . . . only a few weeks prior," and (2) that Frazier "showed extreme cruelty" in light of

evidence showing that after Frazier's father was set on fire, he "attempted to exit the room but was unable to do so," and ultimately suffered a "particularly long and excruciatingly painful" death.  Br. of Resp't (Wash. Ct. App. No. 52078-8-II (2023)), App. C at 13.

Frazier initially opposed the State's request for an exceptional sentence, and he was granted a continuance to prepare for sentencing.  However, there is no indication that he filed a written sentencing brief or any other written opposition to the State's sentencing recommendation.  There is also no transcript of the sentencing hearing in the record presented.  The sentencing court imposed an exceptional sentence of 600 months (50 years), approximately 15 years above the top of the standard range.

In its written findings of fact and conclusions of law, the sentencing court found four aggravating circumstances justifying the exceptional sentence.  Two of these were the aggravators alleged by the State: "deliberate cruelty" and "violat[ing] a position of trust."  COA Br. of Pet'r, App. at 56-57.

The other two aggravators both pertained to "'future dangerousness,'" which at the time was "'recognized as an aggravating circumstance justifying an exceptional sentence.'"  *Id.* at 73 (quoting *State v. Wood*, 57 Wn. App. 792, 801, 790 P.2d 220 (1990)).  First, the sentencing court found that Frazier was "a danger to the community" because of his "ability to commit such a violent act at such a

young age," explicitly treating Frazier's age as "an *aggravating* factor to be considered." *Id.* at 56 (emphasis added). Second, the sentencing court found that despite "prior contact with the juvenile and adult systems," Frazier had not been "amenable to change," and he continued to assert "that he did not commit the crime," making him "highly dangerous to himself and to others." *Id.* at 57.

On direct appeal, Frazier argued that his sentence "was unjustified and clearly excessive." *Id.* at 68; *see* former RCW 9.94A.210(4) (1986). In an unpublished opinion noted at 60 Wn. App. 1066 (1991), the Court of Appeals rejected the sentencing court's "determination of future dangerousness" because its findings were "insufficient to support" consideration of this factor. COA Br. of Pet'r, App. at 74. Nevertheless, the Court of Appeals affirmed Frazier's exceptional sentence, holding that the sentencing court "properly considered" deliberate cruelty and abuse of trust, and that "[t]he shocking cruelty and callousness demonstrated by [Frazier] in the commission of these crimes alone support the sentence." *Id.* at 73-75. Frazier did not seek further review, and his judgment and sentence became final when the mandate issued in June 1991. *See* RCW 10.73.090(3)(b).

B.    Frazier's current PRP

In 2018, Frazier filed a CrR 7.8 motion for resentencing, citing our 2015

7

opinion in *O'Dell*, 183 Wn.2d 680.[2]  Ord. Transferring Def.'s Mot. as a Pers. Restraint Pet., *State v. Frazier*, No. 88-1-00470-4, Attach. at 2 (Kitsap County Super. Ct. June 21, 2018).  In accordance with CrR 7.8(c)(2), the superior court transferred the motion to the Court of Appeals for consideration as a PRP, and counsel was subsequently appointed to represent Frazier.

Frazier's PRP was stayed at the Court of Appeals pending this court's opinions in *Kennedy*, 200 Wn.2d 1, and *Davis*, 200 Wn.2d 75.  After the stay was lifted, Frazier's counsel filed a supplemental brief asserting three exemptions from the one-year time limit for collateral attacks: (1) "substantial, material changes in the law," (2) that "his judgment and sentence is facially invalid," and (3) "newly discovered evidence."  COA Br. of Pet'r at 10-11 (citing RCW 10.73.100(6), .090(1), .100(1)).  The State filed a responsive brief opposing resentencing, and the Court of Appeals dismissed Frazier's PRP as time barred pursuant to RAP 16.11(b).  Ord. Dismissing Pet., *In re Pers. Restraint of Frazier*, No. 52078-8-II, at 1 (Wash. Ct. App. July 20, 2023).

---

[2] This appears to be Frazier's fourth collateral attack.  He filed two PRPs in 2004, both of which were dismissed.  Nos. 31510-6-II, 31707-9-II (Wash. Ct. App.).  He also filed a PRP in 2018 based on *O'Dell*, which the Court of Appeals dismissed as time barred.  Ord. Granting Mot. to Suppl. Pet., Lifting Stay, Den. Mot. for Appointment of Counsel & Den. Pet., *In re Pers. Restraint of Frazier*, No. 52028-1-II (Wash. Ct. App. Sept. 10, 2018) (citing *In re Pers. Restraint of Light-Roth*, 191 Wn.2d 328, 422 P.3d 444 (2018)).

We granted Frazier's motion for discretionary review "only on the issue of newly discovered evidence." Ord. Granting Rev. (Feb. 8, 2024). Two amici briefs supporting Frazier were filed, one from the Fred T. Korematsu Center for Law and Equality and the American Civil Liberties Union of Washington (Korematsu Ctr. & ACLU), and the other from the Redemption Project of Washington.

## ISSUES

A.     Does RCW 10.73.100(1), the newly discovered evidence exemption to the one-year time limit for collateral attacks, apply to evidence that is relevant only to sentencing?

B.     If the newly discovered evidence exemption can apply to sentencing evidence, does Frazier meet his burden of showing that the exemption applies in this case?

## ANALYSIS

Frazier does not challenge his convictions for murder and arson. He challenges only his 50-year exceptional sentence, citing "[n]ewly discovered evidence about teenagers' brain development." Pet'r's Suppl. Br. at 9 (boldface omitted). However, in the State's view, it is impossible to seek resentencing pursuant to RCW 10.73.100(1) because this exemption applies only to "trial facts," that is, evidence pertaining to the defendant's guilt or innocence. Suppl. Br. of Resp't at 7 (boldface omitted). Thus, the primary issue presented in this case is a

narrow, threshold question of law: Is the newly discovered evidence exemption in RCW 10.73.100(1) limited to evidence pertaining to guilt?

In *Kennedy*, we unanimously and explicitly "decline[d]" to limit the newly discovered evidence exemption in this way. 200 Wn.2d at 19-20; *see also Davis*, 200 Wn.2d at 85 ("assuming, as in *Kennedy*, that the newly discovered evidence test applies to sentencing proceedings"). Nevertheless, the State argues that we should reject *Kennedy*'s analysis on this point as "dicta." Suppl. Br. of Resp't at 10. We decline to do so. Regardless of whether *Kennedy*'s analysis is dicta, it is fully supported by principles of statutory interpretation and substantial persuasive precedent. Therefore, we take this opportunity to expressly hold that the newly discovered evidence exemption in RCW 10.73.100(1) applies to sentencing evidence.

Nevertheless, the newly discovered evidence test is very difficult to meet, particularly in the context of "a judge's discretionary sentencing decision." *Kennedy*, 200 Wn.2d at 14. In this case, Frazier does not meet his statutory burden to show that he "acted with reasonable diligence" and, on the minimal record presented, he cannot show that new scientific evidence on adolescent neurodevelopment "will probably change the result" of his exceptional sentence. RCW 10.73.100(1); *Fero*, 190 Wn.2d at 15. Therefore, the newly discovered evidence exemption does not apply and Frazier's PRP is time barred.

A.      The newly discovered evidence exemption can apply to sentencing evidence in appropriate cases

Ultimately, the question of whether RCW 10.73.100(1) applies to sentencing evidence is a question of statutory interpretation. This court's goal in matters of statutory interpretation is "'to determine and give effect to the intent of the legislature.'" *State v. Evans*, 177 Wn.2d 186, 192, 298 P.3d 724 (2013) (quoting *State v. Sweany*, 174 Wn.2d 909, 914, 281 P.3d 305 (2012)). To determine legislative intent, the court looks at the "the plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole." *Id.* (citing *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002)).

As noted above, we have addressed this issue before. In *Kennedy*, an amicus brief "urge[d] this court to limit the newly discovered evidence exemption in RCW 10.73.100(1) to evidence of a defendant's innocence." 200 Wn.2d at 19. In rejecting this argument, *Kennedy* properly interpreted the newly discovered evidence exemption in accordance with well-established principles of statutory interpretation. Today, we reaffirm *Kennedy*'s analysis and expressly hold that

11

RCW 10.73.100(1), the newly discovered evidence exemption, applies to sentencing evidence.

1.     *Kennedy* correctly recognized the legislature's intent in accordance with the plain language of the relevant statutes and court rules

The task of interpreting RCW 10.73.100(1) begins with its plain language: "The time limit specified in RCW 10.73.090 does not apply to a petition or motion that is based solely on . . . [n]ewly discovered evidence, if the defendant acted with reasonable diligence in discovering the evidence and filing the petition or motion." In contrast to the other exemptions listed in RCW 10.73.100, the newly discovered evidence exemption does not specify whether it applies to convictions, sentences, or both. *See* RCW 10.73.100(2)-(7).[3]  Therefore, to discern the legislature's intent, *Kennedy* appropriately considered the statute in its broader legal context, concluding that "the newly discovered evidence exemption is properly read in relation to the definitions of unlawful restraint in RAP 16.4." 200 Wn.2d at 19. Today, we reaffirm *Kennedy*'s approach.

RAP 16.4 provides the grounds on which an appellate court may grant relief in a PRP.  Relief may be granted only if the petitioner is "under a 'restraint' . . . and the petitioner's restraint is unlawful." RAP 16.4(a).  A person who is

---

[3] As discussed further below, RCW 10.73.100 was amended in 2024 to add a new exemption for "[a] motion for a modification of conditions of community custody pursuant to RCW 9.94A.703 and 9.94A.709." LAWS OF 2024, ch. 118, § 8(6).  The language of the newly discovered evidence exemption was not affected.

incarcerated pursuant to a criminal judgment and sentence is certainly under a "restraint," and there are various reasons such a restraint may be "unlawful." *Id.* § (b). Relevant to this case, a restraint is unlawful where "'[m]aterial facts exist which have not been previously presented and heard, which in the interest of justice require vacation of the conviction, *sentence*, or other order.'" *Id.* § (c)(3) (emphasis added). In addition, RAP 16.4(d) explicitly incorporates the statutory time limit, providing that relief may be granted on a PRP only "if such relief may be granted under RCW 10.73.090, or .100."

"Given the intersection of these appellate rules and statutes," *Kennedy* appropriately determined that "the newly discovered evidence exemption is properly read in relation to" RAP 16.4(c)(3), which explicitly applies to sentences. 200 Wn.2d at 19. Moreover, though courts must faithfully apply "common law and statutory requirements that protect society's interest in the finality of judgments," the State's restrictive interpretation of RCW 10.73.100(1) is unnecessary to accomplish that purpose. *In re Pers. Restraint of Garcia-Mendoza*, 196 Wn.2d 836, 846, 479 P.3d 674 (2021). To the contrary, as *Kennedy* observed, principles of finality are well protected by the stringent newly discovered evidence test, for which "sufficient guidance is found in RCW 10.73.100(1) and existing precedent setting out the five factors for the newly discovered evidence exemption." 200 Wn.2d at 19.

Nevertheless, the State argues that *Kennedy* misinterpreted RCW 10.73.100(1) and that we should now reject *Kennedy*'s analysis as nonbinding dicta. We decline to do so. Indeed, far from undermining *Kennedy*'s analysis, the State's arguments in this case reinforce the conclusion that, dicta or not, *Kennedy*'s interpretation of RCW 10.73.100(1) was correct.

> 2.     *Kennedy* correctly interpreted RCW 10.73.100(1) as a matter of first impression in the context of sentencing evidence

The State's primary criticism of *Kennedy* is that "no Washington court has held that this [newly discovered evidence] exception applies to sentencing." Suppl. Br. of Resp't at 7. This is certainly true; *Kennedy* expressly acknowledged "that the newly discovered evidence exemption has never been applied in this context." 200 Wn.2d at 19. As a result, *Kennedy* approached the issue as a matter of first impression, conducted a careful statutory analysis, as discussed above, and declined to categorically exclude sentencing evidence from the newly discovered evidence exemption. *Id.* at 19-20.

In the present case, as noted by amicus, "the State does not cite any cases where the 'newly discovered evidence' test was held *inapplicable* to sentencing." Amicus Br. of Redemption Project of Wash. at 6 (emphasis added). Thus, the State does not ask us to reject *Kennedy* based on contrary precedent that we overlooked; the State cites no contrary precedent. Instead, the State argues that we should reject *Kennedy* because that opinion approached the application of RCW

14

10.73.100(1) to sentencing as a matter of first impression. According to the State, there *are no* matters of first impression in this context because the scope of the newly discovered evidence exemption was definitively "'settled,'" for all purposes and in all contexts, "by 1935," over 50 years before RCW 10.73.100 was enacted. Suppl. Br. of Resp't at 13 (citing *State v. Adams*, 181 Wash. 222, 229-230, 43 P.2d 1 (1935); *Libbee v. Handy*, 163 Wash. 410, 418, 1 P.2d 312 (1931)).

The State is certainly correct that preexisting case law applying the newly discovered evidence test is relevant to our interpretation of RCW 10.73.100(1). As we have often recognized, "[t]he legislature is presumed to know the law in the area in which it is legislating," which includes existing precedent. *Wynn v. Earin*, 163 Wn.2d 361, 371, 181 P.3d 806 (2008). However, by focusing exclusively on precedent that supports its interpretation, the State paints an incomplete and misleading picture of the relevant legal landscape.

First, as discussed above, *Kennedy* correctly recognizes that RAP 16.4(c)(3) was a key feature of the law governing newly discovered evidence when RCW 10.73.100(1) was enacted. 200 Wn.2d at 19-20. This rule explicitly allows a petitioner to seek relief from an unlawful "'*sentence*,'" and "the newly discovered evidence exemption is properly read in relation to" this language. *Id.* at 19 (quoting RAP 16.4(c)(3)). In this case, the State argues that *Kennedy* improperly relied on the language of RAP 16.4(c)(3) to "expand the scope of the newly-

discovered evidence rule." Suppl. Br. of Resp't at 16. However, the State's argument explicitly *starts* from the premise that newly discovered evidence does not apply to sentencing. In other words, the State assumes the very point it seeks to prove. This circular argument does not provide an adequate basis to reject *Kennedy*'s thoughtfully reasoned analysis.

Moreover, the State overlooks the ways in which criminal sentencing has changed over time, which is highly relevant to our interpretation of RCW 10.73.100(1) as applied to sentencing. As noted, the State argues that the meaning of the newly discovered evidence rule was conclusively settled by 1935 and, at that time, it did not include sentencing evidence. *Id.* at 13. However, prior to the Sentencing Reform Act of 1981 (SRA), ch. 9.94A RCW, sentencing evidence, as we know it today, largely did not exist. Instead, the sentencing court's role was typically limited "to 'fix[ing] the maximum term,'" a task in which "[t]he court had no discretion." *State v. Cyr,* 195 Wn.2d 492, 499, 461 P.3d 360 (2020) (quoting RCW 9.95.010). Thus, as amicus correctly argues, "[t]here is an obvious reason for the dearth of 'new evidence' cases involving resentencing. In the decades preceding the [SRA] . . . there were no sentencing facts to contest."[4] Amicus Br. of Redemption Project of Wash. at 6.

---

[4] One exception may be the penalty phase of a capital case. The State observes that "[n]ot even in death penalty cases has this exemption been applied to sentencing." Suppl. Br. of

16

In addition, although the State cites early civil cases to support its argument, the State fails to acknowledge the broad scope of the newly discovered evidence test in the civil context. *See* Suppl. Br. of Resp't at 13 (citing *Libbee*, 163 Wash. 410). Although civil cases are not controlling here, they are subject to the same, well-established five-factor test:

> A new trial will not be granted on that ground unless the moving party demonstrates that the evidence (1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; *and* (5) is not merely cumulative or impeaching.

*State v. Williams*, 96 Wn.2d 215, 222-23, 634 P.2d 868 (1981); *cf. Kurtz v. Fels*, 63 Wn.2d 871, 874, 389 P.2d 659 (1964).

If this five-factor test were limited to evidence of *guilt* in the criminal context, as the State contends, one might expect it to be similarly limited to evidence of *liability* in the civil context. It is not. To the contrary, we have expressly applied the newly discovered evidence test to grant a new civil trial "limited to the issue of damages," even where "[t]he issue of defendants' negligence ha[d] been finally resolved as a matter of law." *Kurtz*, 63 Wn.2d at

---

Resp't at 10. Again, however, the State does not cite any case holding that the newly discovered evidence exemption *cannot* apply to capital sentencing. Contrary to the State's view, the fact that an argument has not been considered in a previous case does not prove that the argument must be rejected the first time it is raised.

878, 875. Though not definitive, this suggests that the scope of the newly discovered evidence test has never been as narrow as the State now claims.

Thus, the State's criticisms of *Kennedy* are misplaced. No prior case law has categorically excluded sentencing evidence from the newly discovered evidence rule, and we decline to do so in this case.

>3.  Persuasive precedent and legislative history show that the newly discovered evidence exemption applies to sentencing evidence

As discussed above, *Kennedy*'s statutory interpretation is consistent with RCW 10.73.100(1)'s plain language and broader legal context. However, to the extent there is any remaining ambiguity, years of persuasive precedent and legislative history compel the same conclusion.

First looking to persuasive precedent, youthful and juvenile offenders are regularly resentenced where the original sentencing court failed to adequately consider the defendant's youth. There is considerable variation in these cases, of course. Sometimes, the failure to consider youth amounts to constitutional error; in other cases, it merely represents a failure to exercise statutory discretion. *E.g.*, *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012); *State v. Delbosque*, 195 Wn.2d 106, 456 P.3d 806 (2020); *O'Dell*, 183 Wn.2d 680.

Nevertheless, all such cases are united by the common theme of "science and social science," consistent with "what 'any parent knows,'" regarding the immaturity, vulnerability, and potential for reform shared by juveniles and young

adults. *Miller*, 567 U.S. at 471 (quoting *Roper*, 543 U.S. at 569). Our long-standing application of scientific evidence to the sentencing of youthful offenders is fully consistent with applying the newly discovered evidence exemption to sentencing evidence in appropriate cases. The State's contrary interpretation is in tension, if not actual conflict, with these principles.

In addition, legislative history strongly supports the analysis and interpretation set forth in *Kennedy*. Prior to 1989, there was "no time limit on filing a [PRP]." FINAL B. REP. SUBSTITUTE H.B. 1071, at 2, 51st Leg., Reg. Sess. (Wash. 1989). In 1989, the legislature enacted a statutory one-year time limit, RCW 10.73.090, along with the exemptions listed in RCW 10.73.100. LAWS OF 1989, ch. 395, §§ 1-2.

The final bill report accompanying the 1989 legislation notes that "[c]ourt rules" had already established the substantive grounds for relief in a PRP, which should inform the exemptions to the statutory one-year time limit. FINAL B. REP., SUBSTITUTE H.B. 1071, at 1, 51st Leg., Reg. Sess. (Wash. 1989). Although the bill report does not explicitly state *which* court rules it refers to, the grounds for relief listed in the bill report closely mirror the language of RAP 16.4(c). *Id.* Thus, *Kennedy* was clearly correct to conclude that the legislature did rely, at least in part, on RAP 16.4(c) in enacting RCW 10.73.100. As discussed above, the newly

discovered evidence provision in RAP 16.4(c)(3) explicitly applies to sentences, as well as convictions.

Finally, the legislature's actions after we decided *Kennedy* confirm that our interpretation is consistent with legislative intent. Our legislature wisely, and regularly, exercises its authority to correct this court's statutory interpretations by "amending the specific section in question" or otherwise "making clear" its intent with revised statutory language. *Friends of Snoqualmie Valley v. King County Boundary Rev. Bd.*, 118 Wn.2d 488, 496, 825 P.2d 300 (1992). Indeed, it has done so very recently in response to *State v. Hubbard*, 1 Wn.3d 439, 527 P.3d 1152 (2023). *Hubbard* was decided less than a year after our opinion in *Kennedy*, addressing a different issue relating to the same newly discovered evidence exemption.

In *Hubbard*, we declined to apply RCW 10.73.100(1) to a defendant's motion to modify court-imposed community custody conditions based on a change in circumstances that arose after sentencing. *Id.* at 451-52. The legislature quickly responded to correct our interpretation, but it did not amend the language of RCW 10.73.100(1). Instead, the legislature added an entirely new exemption to RCW 10.73.100, specifically applicable to "[a] motion for a modification of conditions of community custody." LAWS OF 2024, ch. 118, § 8(6); *see* FINAL B. REP.,

ENGROSSED SUBSTITUTE H.B. 2303, at 2, 68th Leg., Reg. Sess. (Wash. 2024) (citing *Hubbard*, 1 Wn.3d 439).

This 2024 amendment was the first time the legislature amended RCW 10.73.100 since its enactment in 1989. The legislature amended other statutes in the same bill, but it made no changes to the newly discovered evidence exemption. *See* LAWS OF 2024, ch. 118. The legislature's prompt action in response to *Hubbard*, with no corresponding action in response to *Kennedy*, strongly indicates the legislature agrees with *Kennedy*'s interpretation. Indeed, we generally "presume[ ] that the legislature is aware of judicial interpretations of its enactments and take[ ] its failure to amend a statute following a judicial decision interpreting that statute to indicate legislative acquiescence in that decision." *City of Federal Way v. Koenig*, 167 Wn.2d 341, 348, 217 P.3d 1172 (2009).

Thus, RCW 10.73.100(1), the newly discovered evidence exemption to the one-year time limit for collateral attacks, can apply to sentencing evidence in appropriate cases. The State's contrary reading of the statute is not supported by principles of statutory interpretation, legislative history, or persuasive authority. Moreover, the State's narrow interpretation of RCW 10.73.100(1) is unnecessary to protect the strong interest in finality of judgments and sentences, due to the high burden petitioners must meet to satisfy the newly discovered evidence exemption. Indeed, as we have already recognized, this burden is particularly difficult to

21

satisfy in the context of "a judge's discretionary sentencing decision." *Kennedy*, 200 Wn.2d at 14.

        4.     Guidelines for applying the newly discovered evidence exemption to sentencing evidence

Although RCW 10.73.100(1) can apply to newly discovered sentencing evidence, it does not create a per se rule entitling any petitioner to relief. To the contrary, a person seeking resentencing based on the newly discovered evidence exemption must satisfy a stringent test. First, to avoid the time bar, the petitioner must meet the statutory diligence requirements of RCW 10.73.100(1) and the five-factor test for newly discovered evidence set forth in our case law. *Kennedy*, 200 Wn.2d at 19. Then, to obtain relief, they must "establish actual prejudice arising from a constitutional error or a nonconstitutional error that constitutes a fundamental defect resulting in a complete miscarriage of justice." *Davis*, 200 Wn.2d at 86.

These are the same requirements that apply when a person challenges their conviction based on newly discovered evidence. Nevertheless, the analysis warrants special consideration in the context of sentencing, particularly as applied to evidence of new scientific developments and social science research. We therefore take this opportunity to provide general guidelines for applying the newly discovered evidence exemption in this context.

a. Statutory diligence

First, RCW 10.73.100(1) requires the petitioner to show that they "acted with reasonable diligence in discovering the evidence and filing the petition or motion." If the petitioner does not satisfy this statutory diligence requirement, then the newly discovered evidence exemption does not apply, regardless of the five-factor test. *State v. Wheeler*, 183 Wn.2d 71, 80-81, 349 P.3d 820 (2015). This result may appear harsh in some cases, but we must "'give effect to the intent of the legislature'" as reflected by the plain statutory language. *Evans*, 177 Wn.2d at 192 (quoting *Sweany*, 174 Wn.2d at 914). Here, RCW 10.73.100(1)'s plain language places an affirmative burden on petitioners to show they acted with reasonable diligence.

The term "acted with reasonable diligence" is not statutorily defined. However, similar to the one-year time bar for collateral attacks, the statutory diligence requirement is clearly intended to promote "principles of finality." *Wheeler*, 183 Wn.2d at 81. Yet, in contrast to the one-year time bar, the statutory diligence requirement is not phrased in terms of any specific time frame. *Compare* RCW 10.73.090, *with* RCW 10.73.100(1). Thus, the inquiry cannot be reduced to the simple question of whether a petition was filed "too late." *Contra* concurrence in dissent at 7. Instead, courts must consider evidence of the petitioner's actions and circumstances to determine whether they "acted with reasonable diligence," both "in discovering the evidence" and in "filing the

petition or motion."  RCW 10.73.100(1).

Plainly, to show they "acted" with reasonable diligence, a petitioner must show they made some sort of active efforts; passively waiting for new evidence to come along is not sufficient.  In addition, although "a person does not need to be exceptionally diligent or go to extreme lengths," the statute explicitly requires "reasonable diligence."  Pet'r's Suppl. Br. at 23; RCW 10.73.100(1).  Thus, the petitioner must provide some evidence that they made reasonable efforts to discover the new evidence and file their collateral attack, given the limitations of their circumstances.  Finally, because RCW 10.73.100(1) requires reasonable diligence in discovering the evidence *and* filing the petition, "the act of filing itself" is typically not sufficient.  *Contra* concurrence in dissent at 7.  The petitioner must also show reasonable diligence in discovering the evidence.

Additional considerations arise in the context of new scientific evidence or social science research, such as the adolescent neurodevelopmental research at issue in this case.[5]  Scientific understanding is, by its nature, constantly evolving.

---

[5] We agree with many of the points raised in the dissent's thoughtful discussion of "the framework of intersectionality."  Dissent at 4.  However, we must respectfully observe that Dr. Michael Stanfill's forensic psychological evaluation is *not* the alleged "newly discovered evidence" at issue here.  *Contra id.* at 1, 11, 13-14, 17-19.  To the contrary, Frazier consistently describes the "newly discovered evidence" in this case as "neurodevelopmental evidence documenting the immature brains of youth." Br. of Pet'r at 12 (Wash. Ct. App. 2023) (underlining omitted); *see also id.* at 2, 11-20; Pet'r's Reply Br. at 2, 5-9 (Wash. Ct. App. 2023);

This can make it difficult to determine whether the petitioner was reasonably diligent because, in some cases, the appropriate starting point for measuring the petitioner's diligence may not be clear.

Frazier and allied amici suggest that reasonable diligence should be measured from the time the individual petitioner subjectively became aware of the new scientific studies, pointing to the structural, institutional, and individual barriers faced by many incarcerated individuals filing collateral attacks. *See* Pet'r's Suppl. Br. at 24-28; Amicus Br. of Redemption Project of Wash. at 11-15. The concurrence in dissent suggests Frazier may have faced additional barriers that are not discussed in the record or briefing, including "prison policies and the material realities of incarceration." Concurrence in dissent at 2.

We recognize that a person can only be as diligent as their circumstances allow. *Cf. In re Pers. Restraint of Fowler*, 197 Wn.2d 46, 57, 479 P.3d 1164 (2021) (discussing equitable tolling). Therefore, a petitioner's individual circumstances are highly relevant in assessing the reasonable diligence of their actions. However, if the starting point for reasonable diligence were measured entirely from the petitioner's subjective viewpoint, the statutory diligence

---

Mot. for Discr. Rev. at 3, 11-19; Pet'r's Reply at 6-7; Pet'r's Suppl. Br. at 1-2, 9-19, 22-27. He offers Dr. Stanfill's evaluation in an attempt to *connect* this newly discovered evidence to "Frazier's functioning at the time of the offense," relying in part on debunked "criminal justice theories of the early 1990s of juvenile 'super predators.'" Br. of Pet'r, App. at 61, 66 (Wash. Ct. App. 2023); *see also* Pet'r's Suppl. Br. at 6-7.

requirement would be virtually meaningless, contrary to the legislature's intent. "[W]e must not interpret a statute in a way that renders any portion of it meaningless or superfluous" but, instead, we must give effect to the statute's "'plain meaning as an expression of legislative intent.'" *Kellogg v. Nat'l R.R. Passenger Corp.*, 199 Wn.2d 205, 221, 504 P.3d 796 (2022) (quoting *Campbell & Gwinn*, 146 Wn.2d at 9-10).

Therefore, when a petitioner seeks resentencing based on a new scientific theory or social science research, there must be an objective starting point for measuring reasonable diligence pursuant to RCW 10.73.100(1). Nevertheless, we recognize that many petitioners are incarcerated, with law library access to "case law and court rules, not scientific journals." Pet'r's Suppl. Br. at 26. As a result, we hold that when a petitioner invokes RCW 10.73.100(1) based on new scientific developments or social science research, the objective starting point for measuring reasonable diligence is the point at which the new scientific development became generally known and accepted in the legal community.

General knowledge and acceptance in the legal community occurs when the relevant studies are cited as persuasive authority in a published, final opinion of a Washington appellate court or the United States Supreme Court. However, we must emphasize that RCW 10.73.100(1) provides an exemption for newly discovered *evidence*, not newly recognized *legal theories*. There is a separate

statutory exemption for significant, material, retroactive changes in the law, which should not be conflated with the newly discovered evidence exemption. *See* RCW 10.73.100(7). As a result, courts applying RCW 10.73.100(1) must focus on when the *evidence* became generally known and accepted, not when courts recognized the *legal significance* of such evidence as applied to a particular fact pattern. *Contra* concurrence in dissent at 1-4.

> b.  Five-factor test

In addition to showing reasonable diligence, a petitioner relying on the newly discovered evidence exemption must show that the evidence "(1) will probably change the result of the trial, (2) was discovered since the trial, (3) could not have been discovered before trial by the exercise of due diligence, (4) is material, and (5) is not merely cumulative or impeaching." *Fero*, 190 Wn.2d at 15. There is substantial case law addressing the proper application of this five-factor test, which generally provides "sufficient guidance" as applied to sentencing evidence. *Kennedy*, 200 Wn.2d at 19. However, two factors warrant additional discussion in this context.

First, showing that new evidence "will probably change the result" of a "trial court's discretionary sentencing decision" is exceedingly difficult. *Fero*, 190 Wn.2d at 15; *Kennedy*, 200 Wn.2d at 20. If the new evidence supports a theory of mitigation that *was* raised at the original sentencing hearing, the petitioner is

unlikely to meet their burden because "strengthening the defense's trial theory is not the standard for newly discovered evidence." *Fero*, 190 Wn.2d at 18. By contrast, if the new evidence supports a theory of mitigation that was *not* raised at the original sentencing hearing, then it may be "entirely speculative whether the additional studies . . . would have persuaded the trial court" to impose a lesser sentence. *Kennedy*, 200 Wn.2d at 20. Thus, "in light of the broad range of information that might support mitigation and could have been argued at sentencing," courts must be extremely cautious in applying this factor to sentencing evidence. *Id.*

In addition, showing that new evidence is "material" may be difficult to satisfy in the sentencing context, particularly as applied to evidence of new scientific developments or social science research. *Fero*, 190 Wn.2d at 15. It is not sufficient to cite new scientific research that could be relevant to sentencing a *similar* person for a *similar* offense. Instead, the "materiality" of newly discovered evidence must be determined in accordance with a sentencing court's duty to consider mitigating evidence in each *specific* case.

As we have already recognized in the context of modern studies on adolescent neurodevelopment, a sentencing court "'must do far more than simply recite the differences between juveniles and adults and make conclusory statements'" about the defendant's culpability. *Delbosque*, 195 Wn.2d at 121

28

(quoting *State v. Ramos*, 187 Wn.2d 420, 443, 387 P.3d 650 (2017)). "Instead, the court must 'receive and consider relevant mitigation evidence bearing on the circumstances of *the* offense and the culpability of *the* offender, including both expert and lay testimony as appropriate.'" *Id.* (emphasis added) (quoting *Ramos*, 187 Wn.2d at 443).

Thus, to show that newly discovered scientific studies on adolescent brain development are material to their sentence, a petitioner cannot simply cite the studies and note their age at the time of the offense. Instead, they must show that their *specific* offense reflects *specific* attributes of youth, such as "impulsive judgment" or "susceptib[ility] to peer pressure." *Davis*, 200 Wn.2d at 86. In other words, the petitioner must show that there is a direct connection between the new scientific evidence and *their* offense. *See id.* at 85-86. Although "lay testimony may be sufficient" in some cases, expert testimony may be needed to draw a direct connection between the petitioner's specific offense and novel scientific theories about general patterns of adolescent neurodevelopment. *O'Dell*, 183 Wn.2d at 697; *see also Davis*, 200 Wn.2d at 85-86.

In sum, on the primary issue presented in this case, we expressly hold that the newly discovered evidence exemption can apply to sentencing evidence, subject to the guidance provided above. Nevertheless, on the minimal record

29

presented here, we must conclude that Frazier does not meet his burden of showing that the newly discovered evidence exemption applies to his PRP.

B. Frazier does not satisfy the newly discovered evidence exemption

Frazier argues that his PRP is exempt from the one-year time limit because new scientific evidence on adolescent brain development qualifies as "newly discovered evidence" in accordance with RCW 10.73.100(1). Frazier must carry the burden of proving he is entitled to relief by a preponderance of the evidence. *In re Pers. Restraint of Brooks*, 197 Wn.2d 94, 99-100, 480 P.3d 399 (2021). He cannot do so on the record presented here.

1. Frazier does not satisfy RCW 10.73.100(1)'s reasonable diligence requirement

First, Frazier fails to show that he "acted with reasonable diligence in discovering the evidence and filing the petition." RCW 10.73.100(1).

As discussed above, the objective starting point for measuring Frazier's diligence is the point at which studies on late adolescent neurodevelopment became generally known and accepted in the legal community. This occurred as early as 2005, when the United States Supreme Court's opinion in *Roper* cited as persuasive authority "scientific and sociological studies" demonstrating the diminished culpability of juveniles, explicitly noting that "[t]he qualities that

distinguish juveniles from adults do not disappear when an individual turns 18." 543 U.S. at 569, 574. Indeed, this court frequently cites *Roper* as the seminal case recognizing "studies that establish a clear connection between youth and decreased moral culpability for criminal conduct" that "may persist well past an individual's 18th birthday." *O'Dell*, 183 Wn.2d at 695 (citing *Roper*, 543 U.S. at 574); *see also Kennedy*, 200 Wn.2d at 15-17 (discussing *O'Dell* and *Roper*).

The concurrence in dissent agrees that a petitioner's reasonable diligence must be measured from an "objective starting point." Concurrence in dissent at 1. However, it asserts that the appropriate starting point occurred in 2017, when the Court of Appeals' opinion in *Light-Roth* gave Frazier "notice that courts would apply advances in juvenile brain science to cases like his own." *Id.* at 2 (citing *In re Pers. Restraint of Light-Roth*, 200 Wn. App. 149, 401 P.3d 459 (2017), *rev'd*, 191 Wn.2d 328, 422 P.3d 444 (2018)). This approach improperly conflates newly discovered evidence with significant changes in the law.

As discussed above, RCW 10.73.100(1) addresses newly discovered *evidence*, not newly recognized *legal theories*. The Court of Appeals' opinion in *Light-Roth* did not cite new evidence on adolescent neurodevelopment; it merely advanced a new theory about the legal significance of such evidence, which

ultimately proved erroneous.[6]  Here, Frazier relies on the newly discovered evidence exemption, not the exemption for significant changes in the law. Therefore, we must measure his diligence from when he had notice of the evidence, not its legal significance.

In this case, Frazier filed his CrR 7.8 motion in 2018.[7]  He does not show that he acted with reasonable diligence since the time *Roper* was decided in 2005. He does not even show that he acted with reasonable diligence since the time *O'Dell* was decided in 2015.  Instead, Frazier describes personal and institutional barriers he faced due to "a lifelong intellectual disability and long-term incarceration."  Pet'r's Suppl. Br. at 25.  The concurrence in dissent raises additional barriers sua sponte, asserting that Department of Corrections policies must have "hamstrung" Frazier in his legal research efforts.  Concurrence in dissent at 6.

---

[6] In *Light-Roth*, the Court of Appeals held that *O'Dell*, 183 Wn.2d 680, was a significant change in the law, opining that young adult defendants "could not successfully argue that their youth diminished their culpability before *O'Dell*."  *Light-Roth*, 200 Wn. App. at 154.  This court reversed because the SRA "has always provided the opportunity to raise youth for the purpose of requesting an exceptional sentence downward."  *Light-Roth*, 191 Wn.2d at 336.  The Court of Appeals subsequently dismissed Frazier's PRP, in which he asserted that *O'Dell* was a "significant change in the law."  Ord. Granting Mot. to Suppl. Pet., Lifting Stay, Den. Mot. for Appointment of Counsel & Den. Pet., *In re Pers. Restraint of Frazier*, No. 52028-1-II, at 1 (Wash. Ct. App. Sept. 10, 2018).  Thus, as stated in our order granting review, Frazier's only remaining claim for relief in his current PRP is based on the newly discovered evidence exemption.

[7] Frazier does not claim that he was previously unaware of the procedure for filing collateral attacks, and he acknowledges filing at least one PRP in 2004.  Pet'r's Suppl. Br. at 25 (citing Court of Appeals No. 31510-6-II).

We recognize that such evidence, when asserted by a petitioner and supported by evidence in the record, is highly relevant to assessing the reasonable diligence of the petitioner's actions. Indeed, we agree with Frazier that the statutory diligence requirement should be viewed "as a flexible concept of reasonable behavior depending on the circumstances of the case." Pet'r's Suppl. Br. at 24. However, this inquiry explicitly requires evidence of an individual's circumstances *and* their behavior. Here, Frazier provides evidence of his circumstances, but not his behavior.

Simply put, we cannot know whether Frazier acted with reasonable diligence because we know nothing about his actions. We do not know how he discovered the case law cited in his original CrR 7.8 motion. We do not know if he diligently attempted to conduct legal research but encountered delays due to institutional policies, disability, or other hardships. We do not know if he sought assistance in interpreting relevant case law or drafting his CrR 7.8 motion. We do not know how long he was working on his CrR 7.8 motion before it was filed. We know only that Frazier filed a CrR 7.8 motion for resentencing in 2018, and that his request for appointed counsel was subsequently granted. *See* concurrence in dissent at 5; Letter Ruling, *In re Pers. Restraint of Frazier*, No. 52078-8-II (Wash. Ct. App. Oct. 12, 2021).

On this record, we cannot hold that Frazier met his burden to show that he acted with reasonable diligence. Instead, like the concurrence in dissent, Frazier appears to argue that his "substantial barriers" and "the act of filing itself" should be sufficient to *excuse* him from the statutory diligence requirement. Concurrence in dissent at 7; *see* Pet'r's Suppl. Br. at 23-28. However, no authority allows us to disregard the plain statutory language, and doing so would "undermine principles of finality" our legislature sought to promote. *Wheeler*, 183 Wn.2d at 81. Moreover, as amicus points out, the substantial barriers cited in this case would be "true for virtually every indigent inmate." Amicus Br. of Redemption Project of Wash. at 13. As a result, excusing Frazier from the statutory diligence requirement would be both arbitrary and unfair to countless others like him, who overcame their own barriers to file PRPs seeking resentencing but were denied relief because they did not satisfy a statutory exemption to the time bar. *E.g.*, *Kennedy*, 200 Wn.2d 1; *Light-Roth*, 191 Wn.2d 328.

In this case, Frazier does not meet his burden to show he acted with reasonable diligence in discovering the evidence and filing his PRP, as required by the plain language of RCW 10.73.100(1).

2.  Frazier does not meet his burden to show that new evidence would probably change his sentence

Finally, even if Frazier could show reasonable diligence, the newly discovered evidence exemption does not apply because he cannot satisfy the five-

factor test. Specifically, on the record presented, Frazier does not show that new studies on adolescent neurodevelopment would "probably change the result" of his sentence. *Fero*, 190 Wn.2d at 15.

Frazier argues that the sentencing court "believ[ed] his young age made him more dangerous and blameworthy." Suppl. Br. of Pet'r at 2. He is certainly correct that the sentencing court erroneously treated his young age as an "aggravating factor." COA Br. of Pet'r, App. at 56. Frazier is also correct that sentencing practices have evolved significantly since 1989, due in large part to new studies on adolescent neurodevelopment. We now know that "'[t]he distinctive attributes of youth *diminish* the penological justifications for imposing the harshest sentences,'" contrary to the sentencing court's view in 1989. *O'Dell*, 183 Wn.2d at 692 (emphasis added) (quoting *Miller*, 567 U.S. at 472). Thus, when youth is considered in sentencing, it must be considered as a mitigating factor, not an aggravating one.

However, as discussed above, it is not sufficient to show that new scientific studies would be relevant in sentencing *an* 18-year-old for *a* serious criminal offense. As this court has emphasized, "youth is not a per se mitigating factor" even for juvenile offenders, much less for young adults like Frazier. *State v. Anderson*, 200 Wn.2d 266, 285, 516 P.3d 1213 (2022). Therefore, Frazier must show that *his* sentence would probably change with the benefit of these new

studies because *his* offense reflected the attributes of youth. *Kennedy*, 200 Wn.2d at 20; *Davis*, 200 Wn.2d at 85-86. On the record presented, he cannot do so.

As discussed above, the aggravators based on Frazier's youth do not form the basis for his exceptional sentence; those aggravators were explicitly reversed on appeal. COA Br. of Pet'r, App. at 73-74. Instead, Frazier's exceptional sentence is based on the sentencing court's findings of his "abuse of trust," as well as "[t]he shocking cruelty and callousness" that Frazier demonstrated in murdering his father, which "alone support the sentence." *Id.* at 73-75. These remaining aggravators do not appear to reflect the distinctive attributes of Frazier's youth, but the horrifying nature of his offenses.

We must acknowledge, as the sentencing court did, the abuse of trust and extreme cruelty Frazier showed in pouring gasoline on his 65-year-old father in the basement of the family home, lighting him on fire, and then blocking the door so his father could not escape or seek help. Given these aggravating circumstances and "the broad range of information that might support mitigation and could have been argued at sentencing," Frazier cannot show that he would probably receive a lower sentence with the benefit of modern studies on adolescent neurodevelopment. *Kennedy*, 200 Wn.2d at 20.

Nevertheless, Frazier and allied amici invite us to assume that *all* of the aggravating circumstances found in this case were improperly influenced by the

sentencing court's erroneous view that Frazier's youth increased his culpability. *See* Suppl. Br. of Pet'r at 29; Br. of Amici Curiae Korematsu Ctr. & ACLU in Supp. of Pet'r at 22. We decline to do so. There is no sentencing transcript or other evidence in the record to indicate that the sentencing court relied on Frazier's youth to find that his actions were deliberately cruel and an abuse of trust. We also have no record of any arguments or evidence that Frazier may have presented to the sentencing court. Thus, it is "entirely speculative" whether Frazier would receive a lower sentence with the benefit of modern science on adolescent brain development. *Kennedy*, 200 Wn.2d at 20. Such speculation does not satisfy the newly discovered evidence test because, as we have repeatedly emphasized, "'the standard is probably change, not just possibly change the outcome.'" *Fero*, 190 Wn.2d at 18 (internal quotation marks omitted) (quoting *State v. Gassman*, 160 Wn. App. 600, 609, 248 P.3d 155 (2011)).

In sum, Frazier fails to show "reasonable diligence," as required by RCW 10.73.100(1), and the limited record is insufficient to show that new scientific studies would probably change the result of his sentence. Therefore, we need not reach the issue of prejudice; we affirm the Court of Appeals and hold that Frazier's PRP was correctly dismissed as time barred.

CONCLUSION

We expressly hold that RCW 10.73.100(1), the newly discovered evidence exemption to the one-year time limit for collateral attacks, can apply to sentencing evidence in appropriate cases. However, Frazier does not meet his burden to show that RCW 10.73.100(1) applies in this case. Therefore, we affirm the Court of Appeals order dismissing his PRP as time barred.

_____
Yu, J.

WE CONCUR:

_____              _____

_____              _____
Johnson, J.

_____              _____
Owens, J.

_____              _____
Stephens, J.                                          Chung, J.P.T.

No. 102295-6


WHITENER, J. (dissenting) — I agree with the majority that RCW 10.73.100(1), the "newly discovered evidence" exemption to the one-year time limit for collateral attacks, applies to sentencing evidence in appropriate cases. Majority at 21. However, the majority takes a narrow and unrealistic view of not only what "reasonable diligence" constitutes for someone in Frazier's circumstances but also what produced Frazier's exceptional upward sentence and what exactly the "newly discovered evidence" rebuts. I part with the majority as under the facts of this case, Frazier has met his burden of showing that the newly discovered evidence exemption applies to his petition. Therefore, I would reverse the Court of Appeals and remand to the superior court for resentencing.

Frazier is Black. The majority's holding rests on a narrow reading of Dr. Stanfill's forensic psychological evaluation of Frazier, reading it solely as a recitation on "[m]odern scientific studies on adolescent neurodevelopment" that were unavailable at the time of Frazier's sentencing. Majority at 3. The evaluation prepared by Dr. Stanfill not only rebuts misconceptions and stereotypes concerning Frazier's youth, it rebuts misconceptions and stereotypes concerning Frazier's youth *and* race when they intersect. It is true, finality of criminal cases is appropriate in many cases; however, when we know better, we must do better. *See State v.*

1

*Wallahee*, 3 Wn.3d 179, 189, 548 P.3d 200 (2024); *State v. Towessnute*, 197 Wn.2d

574, 486 P.3d 111 (2020); Letter from Wash. State Sup. Ct. to Members of Judiciary

& Legal Cmty. (June 4, 2020),

https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Ju

diciary%20Legal%20Community%20SIGNED%20060420.pdf

[https://perma.cc/QNT4-H5P7].

ANALYSIS

Frazier turned 18 one week prior to the murder of his father. After a jury trial,

Frazier was convicted of first degree murder and first degree arson. The standard

range Frazier faced for first degree murder was 312 to 416 months and 33 to 43

months for first degree arson. The presentence report recommended "Frazier be

sentenced to the maximum amount of time within the sentencing range of his

offender score" and described Frazier as ethnically "African," despite being born

and raised in Bremerton, and as unable to "seek obtainable employment," despite

his youth. Br. of Pet'r (Wash. Ct. App. No. 52078-8-II (2023)), App. at 35-39. The

sentencing court imposed 600 months of confinement for first degree murder and 43

months for first degree arson. To justify the exceptional upward sentence, the

sentencing court made four findings of fact.

[I.]     The defendant's age is an aggravating factor to be considered. At the age of eighteen (18), the defendant is willing to take a life. Because the defendant has demonstrated the ability to commit such a violent act at such a young age the defendant poses a danger to the community.

[II.]   The defendant's conduct during the commission of the crime manifested deliberate cruelty to the victim. The method of murder was particularly cruel in nature to the victim, WALTER FRAZIER.

[III.]  The defendant violated a position of trust in the commission of the First Degree Murder, because of the son/father relationship of he and his father and sharing his father's home.

[IV.]   The defendant's prior contact with the juvenile and adult systems is an aggravating factor. That conduct has been substantial. The defendant's contact with the justice system has not resulted in any substantial change of behavior. The defendant is not amenable to change. The defendant did not change as a result of either treatment, his incarceration at Green Hill, or straight incarceration … as an adult. He therefore presents [a] … risk to the community.

The defendant has convinced himself that he did not commit the crime. The evidence of the defendant's guilt of the crime charged was overwhelming. The defendant, because of his current belief that he did not commit the crime, is therefore more dangerous and in fact highly dangerous to himself and to others.

*Id*., App. at 56-57.

In preparing the forensic psychological evaluation of Frazier, Dr. Stanfill performed a clinical interview and mental health examination of Frazier and looked at several documents, including the presentence report and the findings of fact used to justify the exceptional upward sentence. In Frazier's evaluation, Dr. Stanfill noted that

> [a]t the time he was sentenced, Mr. Frazier's age at the time of the offense (18) was specifically identified as an *aggravating* factor in his case. This practice was consistent with commonly held theories at the time that young offenders that engaged in perceived serious or heinous offenses were potentially more dangerous, ultimately resulting in the criminal justice theories of the early 1990s of juvenile "super predators." However, in the subsequent 30+ years, a large body of research has come to light that consistently demonstrated not only that these theories were wrong, but were based on racist underpinnings that propagated race-based discriminatory criminal justice practices for the next several decades.[1]

*Id.*, App. at 66.

"[C]ommonly held theories" that "were wrong" and "based on racist underpinnings" had impacted Frazier's sentencing. Today we better understand the error of those "commonly held theories" through the framework of intersectionality.

Professor Kimberlé Crenshaw created the sociological analytical framework called intersectionality to address the problems inherent in the traditional "single-axis" framework, where one analyzes discrimination caused by one identity in isolation from other simultaneously held identities. Kimberlé Crenshaw, *Demarginalizing the Intersection of Race and Sex: A Black Feminist Critique of Antidiscrimination Doctrine, Feminist Theory and Antiracist Politics*, UNIV. CHI. LEGAL F. 139 (1989). Intersectionality is a lens to better understand the ways

---

[1] Dr. Stanfill also includes a citation "for broad overview" of the "race-based discriminatory criminal justice practices" in a footnote, pointing to *The Myth of the Juvenile Superpredator*, authored by Victor E. Kappeler, Karen S. Miller, and Gary Potter, found in *Handbook of Juvenile Justice: Theory and Practice* (Barbara Sims & Pamela Preston eds., 2006).

systems and structures of power interact with our multiple and simultaneously held identities. Identities include characteristics such as race, sex, gender, sexual orientation, age, and disability. Professor Crenshaw first used intersectionality to analyze the double layer of discrimination of race and gender Black women faced that would be largely invisible in the "single-axis framework that is dominant in antidiscrimination law." *Id.* For example, Black women who faced discrimination in hiring from an employer that never hired Black women but readily hired white women and Black men would fail to receive protection under the "single-axis analysis" used in Title VII, because the employer hired women, even if only white, and hired Blacks, even if only men. *See id.* at 141-49.

Similarly, the majority uses a "single-axis" framework in the instant case. Majority at 3, 30-34. Looking solely at Frazier's youth, it ignores how, at the time, the intersection of Frazier's youth and race affected his sentencing. This narrow and unrealistic view ignores the "basic truth that young people's experiences are shaded by a societal structure where race matters." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 364, 143 S. Ct. 2141, 216 L. Ed. 2d 857 (2023) (Sotomayor, J., dissenting). Today we are learning about the pervasive adultification,[2] otherization, or dehumanization of Black youth.

---

[2] "'[I]t is well established by empirical literature and has been acknowledged by [this court] that Black children are prejudiced by … "adultification," or the tendency of society to view Black children as older than similarly aged

5

Misconceptions and stereotypes lead to implicit biases against youth of color. All of which must be disavowed. *See* Letter from Wash. State Sup. Ct., *supra*.

In the 1980s, an increase in juvenile crime metrics led state legislatures to pass laws limiting the jurisdiction of juvenile courts and increase punishments for juveniles. CONG. RSCH. SERV., JUVENILE JUSTICE: OVERVIEW OF LEGISLATIVE HISTORY AND FUNDING TRENDS 1 (Jan. 2007). Washington State was not immune from the fears of a growing juvenile crime wave, as members of the legislature described "the escalating incidence of violence in the United States, particularly violence among juveniles," as a "'tidal wave,'" an "'epidemic,'" and "'unprecedented.'" H.B. REP. ON ENGROSSED SUBSTITUTE H.B. 2906, 53rd Leg., Reg. Sess. (Wash. 1994). The consequences of these fears fell disproportionately on youth of color. In 1995, the cultural climax of these fears of youth of color would be captured in John DiIulio Jr's *The Coming of the Super-Predators*. DiIulio would describe an upcoming wave "of youth crime and violence" that would sweep big cities. John DiIulio, *The Coming of the Super-Predators*, WASHINGTON EXAMINER (Nov. 27, 1995, 5:00 a.m.), https://www.washingtonexaminer.com/magazine/1558817/the-coming-of-the-

---

youths.'" *State v. Anderson*, 200 Wn.2d 266, 312, 516 P.3d 1213 (2022) (Yu, J., dissenting) (first and second alterations in original) (quoting *In re Pers. Restraint of Miller*, 21 Wn. App. 2d 257, 265, 505 P.3d 585 (2022)). "There can be no doubt that 'adultification is real and can lead to harsher sentences for children of color if care is not taken to consciously avoid biased outcomes.'" *Id*. at 313 (Yu, J., dissenting) (quoting *Miller*, 21 Wn. App. 2d at 267).

super-predators/ [https://perma.cc/2CHD-MC49]. He warned of "boys whose voices have yet to change … who have absolutely no respect for human life and no sense of the future." *Id*. DiIulio believed that the "trouble will be greatest in [B]lack inner-city neighborhoods" and that the root cause of this upcoming wave was "moral poverty," mired in racist tropes about Blacks, such as the Black family being fatherless. *Id*. The "superpredator" was not a new concept, just the most recent iteration of othering and dehumanizing youth of color.

> The "superpredator" was constructed as the ultimate other, as possessing all the characteristics that innocent young children do not. The "superpredator" was "brutally remorseless," incorrigible, and savage. And because the "superpredator" was the antithesis of childhood, it was slyly constructed as young, Black, and male. This racially characterized "superpredator" was in fact a monster, and only the most serious and determined efforts could address the threat that the "superpredator" posed.

Kenneth B. Nunn, *The Child as Other: Race and Differential Treatment in the Juvenile Justice System*, 51 DEPAUL L. REV. 679, 713 (2002). While DiIulio's hypothesis of an upcoming juvenile crime wave was ultimately wrong, as crime metrics persistently dropped in the 1990s, the beliefs that his theory were premised on and the laws that they were premised on show his theory still exists. OFF. OF JUV. JUST. & DELINQUENCY PREVENTION, U.S. DEP'T OF JUST., CHALLENGING THE MYTHS, 1999 NATIONAL REPORT SERIES: JUVENILE JUSTICE BULLETIN (Feb. 2000), https://www.ojp.gov/pdffiles1/ojjdp/178993.pdf [https://perma.cc/78PW-N8L6].

*In re Pers. Restraint of Frazier*, No. 102295-6
Whitener, J., dissenting

DiIulio's article *The Coming of the Super-Predators* was not the inception of these "commonly held theories" concerning Black youth, it simply tapped into and amplified racial stereotypes that date back to the founding of our nation. *State v. Belcher*, 342 Conn. 1, 17, 268 A.3d 616 (2022). These stereotypes, often coded in pseudoscience, justified treating youth of color as beneath white youth. THE CAMPAIGN FOR FAIR SENT'G OF YOUTH, THE ORIGINS OF THE SUPERPREDATOR: THE CHILD STUDY MOVEMENT TO TODAY 2 (May 2021).

"Adolescence" as a concept did not exist in the United States until approximately 1830, where childhood was finally viewed as "a distinct stage of life committed to learning and development." Nunn, *supra*, at 680. The concept of "adolescence" would soon inspire the first child labor laws in the nation. *Id*. However, while "adolescence began for white children in 1830," Black children, being born directly into bondage, remained slaves. *Id*. The different perception and treatment of youth of color persisted post-emancipation. Academic works of the early 20th century would perpetuate the "otherness" of youth of color in the wrappings of pseudoscience. Lewis Terman, a pioneer of educational psychology and an often-cited psychologist, relating "feeble-mindedness" of Black youth and youth of color to criminality, wrote:

8

> But why do the feeble-minded tend so strongly to become delinquent? The answer may be stated in simple terms. Morality depends upon two things: (a) the ability to foresee and to weigh the possible consequences for self and others of different kinds of behavior; and (b) upon the willingness and capacity to exercise self-restraint. That there are many intelligent criminals is due to the fact that (a) may exist without (b). On the other hand, (b) presupposes (a). In other words, not all criminals are feeble-minded, but all feeble-minded are at least potential criminals.

LEWIS M. TERMAN, THE MEASUREMENT OF INTELLIGENCE 11 (1916). Beliefs that "one could predict criminal behavior [in youth] by race and body type," would spread. JAMES BELL, W. HAYWOOD BURNS INST. FOR YOUTH JUST. FAIRNESS & EQUITY, REPAIRING THE BREACH: A BRIEF HISTORY OF YOUTH IN THE JUSTICE SYSTEM 7-8, https://burnsinstitute.org/wp-content/uploads/2020/09/Repairing-the-Breach-BI_compressed.pdf [https://perma.cc/A5YZ-RA25]. Youth would be divided into "normal" or "feeble-minded." *Id*. Those who were deemed "feeble-minded" were believed to be "unredeemable," and unsurprisingly those deemed "feeble-minded" were also disproportionately Black and youth of color. *Id*. The impact of these stereotypes is seen in Washington. Black youth are 9 percent of Washington's youth population, but they are 18 percent of youth adjudications and 33 percent of juvenile declines, where they are treated as adults. HEATHER EVANS & EMILY KNAPHUS-SORAN, THE PERSISTENCE OF RACIAL DISPARITIES IN JUVENILE DECLINE IN WASHINGTON STATE 2009-2022, at ii (Apr. 9, 2024),

9

*In re Pers. Restraint of Frazier*, No. 102295-6
Whitener, J., dissenting

https://courts.wa.gov/subsite/mjc/docs/2024/2.4%20The%20Persistence%20of%20
Juvenile%20Declines%20in%20Washington%20State_4_9_2024.pdf.

Studies using the intersectional analytical framework have only recently considered youth and race in criminal sentencing, allowing us to now see the consequences of the misconceptions and stereotypes youth of color face in the criminal legal system. One recent study concerning sentencing generally found that "race and gender differences are smaller among older defendants and greater among younger defendants … [where] young [B]lack … and Hispanic males … have the highest odds of incarceration and that, in general, [B]lack and Hispanic males overall receive longer sentence lengths." Darrell Steffensmeier et al., *Intersectionality of Race, Ethnicity, Gender, and Age on Criminal Punishment*, 60 SOCIOLOGICAL PERSPECTIVES 810, 812 (2017). "It is reasonable to assume that judges, both as citizens and as elected officials, may share in the general stereotyping in the community, and that group-based attributions (e.g., based on race, ethnicity, gender, or age) will intertwine with [sentencing considerations such as culpability, protecting the community, and practical implications] to influence judges' sentencing decisions." *Id*. at 815. The study's authors conclude that

> [t]he joint constellations of certain offender characteristics, therefore, result in compounded sentence severity for some defendants but greater leniency for others. These social statuses and their intersectionality are

10

> not just individual attributes but cultural categories that shape the distribution of sanctions and criminal punishment. … Our findings demonstrate that these statuses cannot be studied alone but rather interact to produce disparate outcomes by race/ethnicity and gender and age simultaneously, and they show that intersectionality effects are apt to be responsive to cultural contexts of social differentiation.

*Id*. at 830. These studies lay bare the "race-based discriminatory criminal justice practices" that were born from the "commonly held theories" concerning Black youth and youth of color mentioned by Dr. Stanfill. Frazier seeks to rebut these "theories" that he was continuously sentenced under with "newly discovered evidence," as we now know that these "'[t]heories' were wrong." Br. of Pet'r (Wash. Ct. App. No. 52078-8-II (2023)), App. at 66.

No petition to collaterally attack a judgment and sentence may be filed more than one year after the judgment becomes final. RCW 10.73.090. However, the one year time bar of RCW 10.73.090 does not apply if the petition fits within one of the exemptions listed in RCW 10.73.100. Most important to the instant case is the "newly discovered evidence" exemption of RCW 10.73.100(1), which states:

> The time limit specified in RCW 10.73.090 does not apply to a petition or motion that is based solely on … [n]ewly discovered evidence, if the defendant acted with reasonable diligence in discovering the evidence and filing the petition or motion.

Frazier filed a petition in 2018 to collaterally attack his 1989 sentence. He seeks the help of the "newly discovered evidence" exemption of RCW 10.73.100(1) to escape

the one year time bar. The majority is correct, to benefit from this exemption, Frazier must first show that he "acted with reasonable diligence in discovering the evidence and filing the petition." RCW 10.73.100(1). Second, Frazier must satisfy a five-part test establishing that his "newly discovered evidence," specifically the contents of Dr. Stanfill's evaluation, (1) will probably change the result of sentencing, (2) was discovered since the sentencing, (3) could not have been discovered before sentencing by the exercise of due diligence, (4) is material, and (5) is not merely cumulative or impeaching. RCW 10.73.100(1); *State v. Wheeler*, 183 Wn.2d 71, 80-82, 349 P.3d 820 (2015); *In re Pers. Restraint of Kennedy*, 200 Wn.2d 1, 13, 513 P.3d 769 (2022); majority at 25-29. Lastly, Frazier must establish "actual prejudice arising from a constitutional error or a nonconstitutional error that constitutes a fundamental defect resulting in a complete miscarriage of justice." *In re Pers. Restraint of Davis*, 200 Wn.2d 75, 86, 514 P.3d 653 (2022).

The plain language and ordinary meaning must be the starting point when determining what constitutes "reasonable diligence" under RCW 10.73.100(1). *Spokane County v. Dep't of Fish & Wildlife*, 192 Wn.2d 453, 457, 430 P.3d 655 (2018). Rather than a narrow or bright line rule, the legislature explicitly adopted a standard of "reasonable diligence," a standard that takes one's circumstances into account. *Cornelius v. Wash. Dep't of Ecology*, 182 Wn.2d 574, 601, 344 P.3d 199

(2015) ("What constitutes reasonable diligence depends on the circumstances.");

*Langlois v. BNSF Ry. Co.*, 8 Wn. App. 2d 845, 856-57, 441 P.3d 1244 (2019) (When

determining reasonable diligence, courts consider the litigant's overall level of care

and caution in light of their particular circumstances.). Here, the majority adopts a

bright line rule, contrary to the statute's plain language, where the

> objective starting point for measuring reasonable diligence is the point
> at which the new scientific development became generally known and
> accepted in the legal community.
>
> General knowledge and acceptance in the legal community
> occurs when the relevant studies are cited as persuasive authority in a
> published, final opinion of a Washington appellate court or the United
> States Supreme Court.

Majority at 26.

Frazier filed his petition in 2018. When determining the timeliness of

Frazier's petition under its "objective starting point" analysis, the majority uses a

"single-axis" framework for what Frazier's "newly discovered evidence" is and

focuses only on the issue of Frazier's youth at sentencing. Using the years when

*O'Dell*[3] and *Roper*[4] were decided, cases concerning the mitigating qualities of youth,

in relation to when Frazier filed his petition, the majority holds that Frazier did not

exercise "reasonable diligence" in the filing of his petition. Majority at 30-32.

---

[3] *State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015).

[4] *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005).

However, the "newly discovered evidence" in the instant case, the contents of Dr. Stanfill's evaluation, concerns not only misconceptions and stereotypes of Frazier's youth but also the intersecting of Frazier's simultaneously held identities of youth *and* race. Using the majority's "objective starting point" analysis, Frazier filed his petition with "reasonable diligence" as required by RCW 10.73.100(1). In 2022, four years *after* Frazier filed his petition, Division Two in *Miller* cited studies on how adultification can lead to harsher sentences for youth of color. 21 Wn. App. 2d at 267.

Taking Frazier's circumstances into account, as a reasonableness standard requires, it is also clear that Frazier exercised reasonable diligence in the filing of his petition. Frazier is incarcerated, with lifelong intellectual disabilities and a seventh grade education. He is dependent on the help of counsel but is without funds to hire one, so he is also dependent on the court to appoint him one. He filed pro se what eventually became the personal restraint petition for this instant case in 2018 and the Court of Appeals appointed him counsel in 2021.

Frazier's petition satisfies the five-part test required for analyzing "newly discovered evidence." The information contained in Dr. Stanfill's evaluation (1) will probably change the result of sentencing, (2) was discovered since the sentencing, (3) could not have been discovered before sentencing by the exercise of due

14

diligence, (4) is material, and (5) is not merely cumulative or impeaching. *Kennedy*,

200 Wn.2d at 13; majority at 27.

Frazier has established that the "newly discovered evidence" he offers will

"probably change the result" of his sentencing. *Kennedy,* 200 Wn.2d at 13. Dr.

Stanfill, in his evaluation of Frazier, notes that he was sentenced consistent with

"commonly held theories" that were not only "wrong, but were based on racist

underpinnings." Br. of Pet'r (Wash. Ct. App. No. 52078-8-II (2023)), App. at 66.

Those "racist underpinnings" are the result of misconceptions, stereotypes,

otherization, dehumanization, and adultification that Black, Indigenous and youth of

color uniquely suffer apart from white youth. To justify the exceptional upward

sentence, the sentencing court made four findings. The court discussed Frazier's

youth, the "deliberate cruelty" of the crime, Frazier's "position of trust" over his

father, and Frazier's lack of amenability. The findings that discussed Frazier's youth

and lack of amenability were reversed on direct appeal. The majority declines to

consider them here. Majority at 36. However, all four findings are integrally

intertwined and involved negative stereotypes concerning Black youth.

This court has held that factors inherent in the crime, inherent in the sense

that they were necessarily considered by the legislature in establishing the standard

sentence range for the offense and do not distinguish the defendant's behavior from

15

that inherent in all crimes of that type, may not be relied on to justify an exceptional sentence. *State v. Ferguson*, 142 Wn.2d 631, 647-48, 15 P.3d 1271 (2001). Here, Frazier was convicted of first degree murder under RCW 9A.32.030(1)(a) and (c). Subsection (1)(a) already contemplates deliberateness as it describes homicide "[w]ith a premeditated intent to cause the death of another person." RCW 9A.32.030. Subsection (1)(c) is a homicide done in tandem with "the crime of … arson in the first … degree." RCW 9A.32.030(1)(c)(4). Here, the legislature already contemplated "deliberate cruelty" when establishing the standard range. Yet, the sentencing court unable to find "deliberate cruelty" used the intentionality and disturbing method that Frazier employed in the murder of his father to justify an exceptional upward sentence. Evident in Dr. Stanfill's report is the finding of "deliberate cruelty" in Frazier's sentence is consistent with the "commonly held theories" where Black youth "engaged in perceived serious or heinous offenses were potentially more dangerous." *See also* Gustav J.W. Lundberg et al., *Racial Bias in Implicit Danger Associations Generalizes to Older Male Targets*, PLoS ONE, at 2 (June 2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC5991338/pdf/pone.0197398.pdf [https://perma.cc/VEQ3-8ZR7].

An "abuse of a position of trust" generally refers to the trust relationship between the perpetrator and the victim that renders the victim particularly vulnerable to the crime. *State v. Russell*, 69 Wn. App. 237, 252, 848 P.2d 743 (1993). The finding of an aggravating factor in this case is an unusual finding of fact. It is typically found against an *adult defendant* who uses their position of trust as a caretaker over a youthful victim, not vice versa as the sentencing court did here. *See State v. Harp*, 43 Wn. App. 340, 343, 717 P.2d 282 (1986) (defendant father who was a caretaker of his stepdaughter and niece victims); *State v. Creekmore,* 55 Wn. App. 852, 862-63, 783 P.2d 1068 (1989) (defendant father who was a caretaker of his victim son) (abrogation recognized by *State v. Ramos*, 124 Wn. App. 334, 101 P.3d 872 (2004)); *Russell*, 69 Wn. App. at 252 (defendant father who was a caretaker of his victim son). Here, the sentencing court could not find an "abuse of a position of trust" but used it to justify an exceptional upward sentence. This perception is clearly erroneous as Frazier was a teenager at the time of his crime and was not responsible for the care of his adult father. Frazier's father took care of Frazier, as he lived in his father's house like teenagers typically do. The sentencing court's finding of fact is consistent with the adultification of Frazier as a Black youth, where Frazier is viewed as older and more culpable as compared to equally aged white youth. Phillip Atiba Goff et al., *The Essence of Innocence: Consequences of Dehumanizing Black Children*, 106 J. PERSONALITY SOC. PSYCH. 526, 529 (2014),

17

https://www.apa.org/pubs/journals/releases/psp-a0035663.pdf

[https://perma.cc/7Z9X-TN5W].

Frazier's "newly discovered evidence" would probably change the result of his sentencing. Frazier's counsel at sentencing filed no sentencing memorandum on his behalf, leaving the sentencing court with nothing to place Frazier's crime within the broader context of his life. Most importantly, at the time of his sentencing, there was nothing to rebut the "commonly held theories" that were used to consistently sentence Black youth like Frazier — "[t]heories" that involved misconceptions and stereotypes about Frazier's youth and race when they intersect. Many of these "theories" continue to be debunked, as seen in Dr. Stanfill's evaluation. With what we know now about the intersectionality of youth and race, Frazier's counsel at sentencing could have rebutted the misconceptions and stereotypes used by the sentencing court in assessing Frazier's dangerousness, incorrigibility, and culpability.

Frazier was sentenced in 1989, several decades before research concerning "commonly held theories" and the intersectionality of race and youth at sentencing generally occurred. *See supra*. Frazier could not have discovered this evidence before sentencing by the exercise of due diligence. *Kennedy*, 200 Wn.2d at 13; majority at 30. Research concerning the "commonly held theories" did not occur

until the mid-2000s and research concerning the intersectionality of race and youth at sentencing, specifically, did not occur until 2017. *See* Victor E. Kappeler et al., *The Myth of the Juvenile Superpredator*, HANDBOOK OF JUVENILE JUSTICE: THEORY AND PRACTICE 173 (Barbara Sims & Pamela Preston eds., 2006); Steffensmeier et al., *supra*, at 816.

This "newly discovered evidence" is material to Frazier's case. *Kennedy*, 200 Wn.2d at 13. Whether the evaluation would be determinative of a material issue in his sentencing, Frazier's evaluation directly rebuts the "commonly held theories" that resulted in his exceptional upward sentence. His "newly discovered evidence" is material.

Frazier's evaluation is neither cumulative nor impeaching. *Kennedy*, 200 Wn.2d at 13. "'Cumulative evidence is additional evidence of the same kind to the same point.'" *State v. Williams*, 96 Wn.2d 215, 223-24, 634 P.2d 868 (1981) (quoting *Roe v. Snyder*, 100 Wash. 311, 314, 170 P. 1027 (1918)). Frazier's counsel failed to file a sentencing memorandum on his behalf, so there was no evidence presented at Frazier's sentencing that could have been of "the same kind" and reached "the same point" as Dr. Stanfill's evaluation. In addition, impeachment evidence affects credibility without necessarily proving or disproving the facts of

the case. *State v. Clinkenbeard*, 130 Wn. App. 552, 569, 123 P.3d 872 (2005). Dr. Stanfill's evaluation is not impeachment evidence.

Frazier has established that he filed his petition with "reasonable diligence" to satisfy the five-part test. Lastly, to obtain relief, Frazier is required to establish actual prejudice arising from a constitutional error or a nonconstitutional error that constitutes a fundamental defect resulting in a complete miscarriage of justice. *Davis*, 200 Wn.2d at 86. To show "actual and substantial prejudice," Frazier must show that the outcome would more likely than not have been different had the alleged error not occurred. *Id*.

Frazier has suffered "actual and substantial prejudice." The "commonly held theories" that pervaded Frazier's sentence wrongly increased his perceived dangerousness, incorrigibility, and culpability. Dr. Stanfill's evaluation of Frazier rebutted those misconceptions and stereotypes. It is "more likely than not" that the outcome of his sentencing would have been different. With a timely filed petition that satisfies the five-part test under RCW 10.93.100(1), Frazier is entitled to a resentencing.

CONCLUSION

I would reverse the Court of Appeals and remand to the superior court for resentencing.

Whitener, J.

Gordon McCloud, J.

Montoya-Lewis, J.

No. 102295-6

GONZÁLEZ, C.J. (concurring in dissent) — "'[C]hildren are different.'" *State v. Houston-Sconiers*, 188 Wn.2d 1, 8, 391 P.3d 409 (2017) (alteration in original) (quoting *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012)). Charles Scott Frazier was barely an adult when he committed a horrific crime. Since that day, we have recognized not only that children are different but also that young adults, like Frazier was when he committed his crime, share some of the qualities of youth that make bringing the full force of standard range sentences down on them unjust in some circumstances. We now allow young adults to argue for a mitigated sentence based on their youth. I would give Frazier the opportunity to make that argument. Accordingly, I respectfully dissent.

At this stage, the issue is not what the appropriate sentence is in this case. It is whether Frazier gets the opportunity to argue for a different sentence at all. I concur with the majority that sentencing evidence can qualify as newly discovered evidence under RCW 10.73.100(1). However, in my view, the objective starting point for assessing Frazier's diligence under the newly discovered evidence exemption is 2017, with the publication of the Court of Appeals decision in *Light-Roth*. *In re Pers. Restraint of Light-Roth*, 200 Wn. App. 149, 401 P.3d 459 (2017), *rev'd*, 191 Wn.2d

*In re Pers. Restraint of Frazier*, No. 102295-6 (González, C.J., concurring in dissent)

328, 422 P.3d 444 (2018). It was *Light-Roth* (not *Roper v. Simmons*[1] or *State v. O'Dell*[2]) that made Frazier's youth a reasonable basis for him to seek a lesser sentence. Frazier filed within 10 months of the Court of Appeals decision in *Light-Roth* giving him notice that courts would apply advances in juvenile brain science to cases like his own. That was sufficiently diligent.

While I concur with the dissent in its entirety, I write separately to stress that an assessment of reasonable diligence must consider not only one's education, disability, and reliance on appointment of counsel but also prison policies and the material realities of incarceration.[3] For penological reasons, Department of Corrections (DOC) policy prohibits Frazier from possessing case law pertaining to other incarcerated individuals.[4] Consequently, while incarcerated Frazier would have, at best, limited access to relevant case law, including *O'Dell*, the case in which we held that "youthfulness can support an exceptional sentence below the standard range applicable to an adult felony defendant." 183 Wn.2d at 698-99. Furthermore, because

---

[1] 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005).
[2] 183 Wn.2d 680, 358 P.3d 359 (2015).
[3] The dissent summarizes the reality of Frazier's circumstances:

> Frazier is incarcerated, with lifelong intellectual disabilities and a seventh grade education. He is dependent on the help of counsel but is without funds to hire one, so he is also dependent on the court to appoint him one. He filed pro se what eventually became the personal restraint petition for this instant case in 2018 and the Court of Appeals appointed him counsel in 2021.

Dissent at 13-14.

[4] Wash. Dep't of Corr., Policy DOC 590.500 – Legal Access for Incarcerated Individuals (last revised Oct. 6, 2022). This policy has been in effect since 2000. https://www.doc.wa.gov/ information/policies/files/590500.pdf [https://perma.cc/CLX8-KH3V].

2

*O'Dell* was on direct review, Frazier should be forgiven for not immediately recognizing it might apply to a collateral challenge. But most importantly, I find it difficult to imagine how Frazier could meaningfully and expeditiously prepare a personal restraint petition predicated on case law he was prohibited from possessing. Frazier should not be penalized for the effects of this Department of Corrections policy.

I.      The objective starting point for assessing Frazier's reasonable diligence should begin in 2017 with the appellate decision in *Light-Roth*

The majority reasons that because the United States Supreme Court cited scientific studies on adolescent neurodevelopment as early as 2005, that should be the objective starting point for measuring Frazier's diligence. Majority at 3 (citing *Roper*, 543 U.S. at 574). I agree that *Roper* is an important and relevant case. But *Roper* alone could not have given Frazier "notice" that evolving juvenile brain science would be relevant evidence in *his* case.

*Roper* is not a case about resentencing. *Roper* is a death penalty case in which the Supreme Court held that executing juveniles for capital offenses violated the Eighth and Fourteenth Amendments. *Roper*, 543 U.S. at 578. Frazier, who was not a juvenile at the time of his crime and was not sentenced to death, had little reason to rely on *Roper* as establishing a basis for his collateral attack.

We did not extend *Roper* to young adults like Frazier until 2015. *O'Dell*, 183 Wn.2d at 685 (citing *Roper*, 543 U.S. at 569-70). In *O'Dell* we held that "a trial court

3

*In re Pers. Restraint of Frazier*, No. 102295-6 (González, C.J., concurring in dissent)

must be allowed to consider youth as a mitigating factor when imposing a sentence on an offender . . . who committed his offense just a few days after he turned 18." *Id.* at 696. But *O'Dell* was an appeal, not a personal restraint petition. Given this entirely distinct procedural posture, it is unreasonable to expect that Frazier could have gleaned from *O'Dell* a basis for a collateral attack against his more than 30-year sentence. Frazier filed his CrR 7.8 motion promptly after the Court of Appeals held that *O'Dell* constitutes a significant change in the law and applied retroactively to petitioners like himself. *Light-Roth*, 200 Wn. App. at 152.[5]

## II. Reasonable diligence

Frazier suggests our reasonable diligence standard takes one's circumstances into account. Pet'r's Suppl. Br. at 24 (citing *Cornelius v. Wash. Dep't of Ecology*, 182 Wn.2d 574, 601, 344 P.3d 199 (2015)). I agree. Here, Frazier's life experiences militate in favor of holding that he satisfies the reasonable diligence standard. Frazier brought his claims "while experiencing a lifelong intellectual disability and long-term incarceration." *Id.* at 25. In addition, we must evaluate reasonable diligence based on Frazier's ability as an incarcerated pro se litigant with limited legal skills. As Frazier avers, "[h]e was in special education classes throughout his schooling[,] . . . had a third-grade level in written language[,] . . . [and] had no financial resources at the time he was sentenced and has been confined in prison since then." *Id.*

---

[5] Two months after Frazier filed his CrR 7.8 motion, we reversed the Court of Appeals and held that *O'Dell* did not constitute a significant change in the law and did not decide whether that decision applied retroactively to Light-Roth's case. *In re Pers. Restraint of Light-Roth*, 191 Wn.2d at 338.

4

Frazier further explained that he is disabled and in need of legal assistance—suggesting that he sought an accommodation, though he failed to reference the proper legal authorities or make a formal request. Accordingly, Frazier did as much as he could to convey his challenging circumstances to the courts.

> I am a mentally ill inmate. I have been in prison 30 years and can not help myself legaly [sic]. I am allso [sic] poor.
>
> Please allow me to have a [sic] attorney to help me with this new law and how it will help me get a new sentence.
>
> Again I am mentally ill and can not help myself. If this motion can not help me I ask to be given a [sic] attorney to help me as this new case effects [sic] my case.

Ord. Transferring Def.'s Mot. as a Pers. Restraint Pet., *State v. Frazier*, No. 88-1-00470-4, Attach. at 3 (Kitsap County Super. Ct. June 21, 2018).

As the Redemption Project explains, "Requiring someone of limited intellectual ability and schooling to understand the complexities and nuances of neurodevelopmental research and then explain why these advances could change his sentencing outcome sets the bar impossibly high." Amicus Curiae Br. of Redemption Project at 12-13. I agree.

When we evaluate the circumstances affecting incarcerated litigants' ability to bring their claims expeditiously, DOC policies and conditions that affect petitioners are also relevant. Frazier "could not obtain scientific journals of adolescent development from the law library" and relied on case law to inform his understanding of developments in the field of adolescent brain science. Pet'r's Suppl. Br. at 26.

5

Frazier is prevented from "possess[ing] legal materials," such as case law, about "another Washington State incarcerated individual" by DOC policy 590.500 (III)(A)(3).[6] Plainly, this policy did not prevent Frazier from ever learning about *Light-Roth* because he clearly cited the appellate decision in his CrR 7.8 motion. Also plainly, this policy limited his access to critical materials. If DOC policy prevents incarcerated inmates from possessing case law about incarcerated individuals, then prisoners like Frazier can only view and access such materials during the limited time they have in the prison law library. Without being able to take case books and treatises back to his cell, Frazier would have been unable to work on his petition outside the library. A prisoner hamstrung by this DOC policy would take much longer to file a collateral attack than a similarly situated litigant who is not incarcerated. These circumstances are directly relevant to whether Frazier demonstrated reasonable diligence.

In light of these constraints, Frazier was reasonably diligent. To say otherwise undermines this court's holding that the newly discovered evidence exemption can apply to sentencing evidence in appropriate cases. If we say Frazier's 2018 filing is too late, we set the bar unrealistically high for litigants to show reasonable diligence. We should instead recognize that when litigants like Frazier face substantial barriers

---

[6] Wash. Dep't of Corr., Policy DOC 590.500, *supra*.

At the time *O'Dell* was published in 2015, Sean O'Dell was almost certainly incarcerated, having been sentenced to nearly eight years in 2013. *See O'Dell*, 183 Wn.2d at 683.

to filing quickly, the act of filing itself may demonstrate dedication to one's case and diligent engagement with the law.

I would hold that an assessment of reasonable diligence must contend with the realities facing the petitioner. These realities include disabilities, health, personal experiences, reading and writing skills, education, economic circumstances, and incarceration conditions. Furthermore, I would begin the evaluation of Frazier's reasonable diligence with the overruled appellate decision in *Light-Roth*, which occurred in 2017, because that decision, however misguided, first alerted Frazier to the fact that he could benefit from resentencing on the basis of our *O'Dell* decision. Considering Frazier's circumstances, and analyzing reasonable diligence beginning in 2017, it is clear that Frazier exhibited the requisite diligence.

With these observations, I join fully in the dissent.

González, C.J.

Montoya-Lewis, J.