IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| In the Matter of the Personal Restraint of: | No. 85969-2-I |
|---|---|
| STEPHEN WAYNE CANTER, | DIVISION ONE |
| Petitioner. | PUBLISHED OPINION |

HAZELRIGG, C.J. — Stephen Canter, by personal restraint petition, challenges the enforcement of community custody conditions imposed by the Indeterminate Sentence Review Board upon his release. He argues that the procedures utilized by the Department of Corrections to monitor his Internet activities infringe on his fundamental rights and, contrary to constitutional requirements, are not narrowly tailored. We agree and grant the petition.

## FACTS

In February 2016, Canter responded to an online personal ad on Craigslist posted by undercover law enforcement officers pretending to be a mother of young daughters. He used text messages and e-mail to communicate with the "mother" to set the conditions of the encounter, which included sex with the fictitious children, and was arrested when he arrived at the meeting location. The State charged Canter with one count of attempted rape of a child in the first degree and one count of commercial sexual abuse of a minor.

Canter waived his right to a jury trial and instead proceeded to a stipulated facts bench trial in May 2019 on an amended information containing two counts of attempted child molestation in the first degree after which he was convicted as charged. Several months later, on August 20, the court imposed an indeterminate sentence of 50.25 months to life in prison. The judge included several community custody conditions in the judgment and sentence (J&S) and even more in appendix 4.2 to the J&S. The requirements in appendix 4.2 include the following: condition 18 prohibits Canter's use of "computer chat rooms"; condition 20 requires that if the Department of Corrections (DOC) deems it necessary, Canter permit installation of monitoring software on his Internet-enabled devices; and condition 21 prohibits Canter from accessing the Internet from any device without first notifying DOC about that device. Canter appealed his convictions and sentence to this court, both of which were affirmed. *See State v. Canter*, 17 Wn. App. 2d 728, 731, 487 P.3d 916 (2021).

In November 2022, while Canter was serving his prison term, the End of Sentence Review Committee rated him as having a "low risk" of recidivism. The Indeterminate Sentence Review Board (ISRB) held a hearing on Canter's releasability in February 2023, during which it considered "the possible conditions of release and the remaining evidence" before it ultimately found Canter releasable. The ISRB's release order followed in March 2023 and included still more community custody conditions. Relevant here is ISRB condition B, establishing the following:

> You must not access the Internet without developing a signed Board Electronic Device Inventory and Internet Search Requirement form,

> approved by your field case manager that includes a list of all [I]nternet-capable devices in your possession or that you have access to, and installing any special software on your device required by your field case manager in order to monitor your compliance with [I]nternet-related conditions imposed by the court and/or the ISRB. A copy of the signed Board Electronic Device Inventory and Internet Search Requirement form must be provided to the ISRB. The signed form will remain in effect unless amended or removed [sic] the field case manager and the ISRB.

DOC assigned Kimberly Young as Canter's community corrections officer (CCO) in April 2023. After his release from prison, Canter completed the ISRB's inventory and Internet form, which included the following restriction on his Internet use:

> You will install any special software on your device that is required by your Field Case Manager in order to monitor your compliance with [I]nternet-related conditions imposed by the court and/or the ISRB at your expense. Information gathered by monitoring software may be used in subsequent court actions and/or ISRB violation proceedings.

Canter complied and installed monitoring software called "Accountable2You" (A2U) in May 2023. Canter later asserted in briefing to this court that Young told him that in addition to using A2U, he was not allowed to use social media websites because she believed that the prohibition on the use of chat rooms extended to all social media.

CCO Stefanie Watt explained in a declaration prepared for this personal restraint petition (PRP) that A2U monitors Canter's Internet connected devices "in real time for 'trigger words'" including "pornography, porn, sex, penis, vagina, and other various slang words for intimate body parts as well as certain swear words. The trigger words are preset on Accountable2You's software." Watt's declaration further described the level of monitoring relevant to Canter and explained that his

- 3 -

CCO received a weekly e-mail containing his activities that were flagged and deemed "questionable or highly questionable" based on the keywords. She further noted that these activity descriptions contained the "website name, website URL,[1] portions of text located on a website, portions of text from an e[-]mail, portions of text from a text message, or portions of text from a search performed in a search engine."

Keith Hines, an assistant attorney general with the corrections division, included a description of the "Everything" monitoring setting from A2U's website as an attachment to his declaration that was also prepared for this matter.[2] A2U described the "Everything" setting of its software as follows: "The partner will have access to view records and reports of all recorded activity from the device including both non-questionable and questionable ('flagged') activity."[3] A representative from A2U explained to Canter's counsel via e-mail that the "Everything" setting allowed the CCO "to view all activity records that are uploaded to the online report."

The material from A2U's website that Hines provided in his declaration further explained that Internet activity is retained by A2U for fifteen days, after which it is "expunged" and cannot be recovered, although the online detail reports that are generated can be exported for preservation. This A2U documentation also noted that specific applications can be excluded from monitoring.

---

[1] "Uniform resource locator," more commonly referred to as an Internet address.
[2] In a declaration prepared for this litigation, CCO Jonathan Ng confirmed that until March 25, 2025, Canter had been subject to scrutiny under A2U's "Everything" setting.
[3] A2U defines a partner as "the person who receives reports and alerts containing activity from the device being monitored."

In June 2023, Canter, as a self-represented litigant, brought a motion in Snohomish County Superior Court to "clarify or modify" a number of the community custody conditions that had been imposed in his J&S based on the differences between his interpretation of the limitations and Young's. Therein, he alleged that Young had construed the prohibition on "computer chat rooms" to mean that Canter "may not have access [to] or use any social media, instant messaging within the gmail.com or any account, help chat boxes on websites to include the Veterans Administration [(VA)[4]], medical institutions, financial institutions, or work source [web]sites." In response, DOC sought to transfer Canter's motion to the Court of Appeals as a PRP.

The trial court ordered the parties to appear for oral argument on the motion, which occurred on June 26, 2023. On July 27, the trial judge issued an order clarifying some of the conditions set forth in Canter's J&S.[5] The court specifically addressed the condition banning Canter from using Internet chat rooms and clarified its narrow interpretation of that term. The judge expressly stated that their use of the phrase "chat rooms" was "intended to mean a channel or [web]site online where conversation occurs only in real time by text for non-business purposes by a group communicating about a limited common non-business interest in communications regarding sexual contact with minors." The court further explained that its intent was to bar Canter from chat rooms "where historically

---

[4] We interpret Canter's use of "Veteran's Administration" in his motion as a reference to the United States Department of Veterans Affairs.

[5] The resulting ruling by the trial court addressed only Canter's request for clarification of condition 18, the ban on accessing "computer chat rooms," and as to condition 20 regarding DOC use of monitoring software. After the trial court issued its ruling, Canter moved to withdraw his motion to clarify the remaining conditions and the court granted that motion.

pedophiles sometimes congregated" but the condition was not intended "to include generally all of Facetime,[6] Zoom,[7] Texting, Facebook,[8] e[-]mailing, or all other types of social media generally." The court provided further monitoring guidance and clarified that Canter's use of these platforms was restricted under this condition only if it "is used by persons for real time communication regarding illegal purposes of a sexual nature related to this crime, such as viewing child pornography or contacting minors for sexual purposes."

However, the court also reiterated that the ISRB has the authority to impose its own conditions to monitor Canter's Internet access and DOC has the authority to effectuate those conditions via monitoring. The court expressly cautioned DOC against monitoring "anything and everything" and explicitly warned that surveillance of Canter's communication with his attorney was not permitted.[9]

In August 2023, Canter provided Young with a copy of the court's clarification order in an attempt to have DOC revise its monitoring based on Canter's own interpretation of the order. He later sent a copy of the order directly to the ISRB, along with a letter explaining the procedural history of his interactions with Young about these conditions. In response, a hearing investigator for the

---

[6] "Facetime" is a videoconferencing application.
[7] "Zoom" is a videoconferencing platform.
[8] "Facebook" is a social media and social networking service.
[9] The trial court noted,

The intent of this provision [allowing DOC monitoring of Canter's devices that access the Internet] was that DOC can monitor internet activity to monitor compliance with ordered conditions, *not just monitor anything and everything*. This provision does not prohibit DOC from doing more monitoring if required by ISRB to match additional provisions used by ISRB. *However, it would not permit monitoring things such as communication with the Defendant's attorney. This clarification and interpretation is necessary as without it the condition may be illegal.*

(Emphasis added.)

ISRB e-mailed Canter and advised him that "the [ISRB] has determined that they will not be changing their position on this topic" and emphasized both its independent authority to impose additional conditions and DOC's discretion in implementing those conditions.

In September 2023, Canter filed a motion to compel the ISRB and DOC to comply with the J&S as clarified by the July 27 trial court order, asserting that DOC and the ISRB needed to narrowly tailor the enforcement of conditions that authorized monitoring his use of the Internet. In its response to Canter's motion, DOC asserted that it could not "be a party to this criminal action" and the trial court did "not have personal jurisdiction or subject matter jurisdiction over DOC in [that] criminal proceeding." The trial judge conceded a lack of jurisdiction, agreed with DOC that the motion should be transferred to the Court of Appeals as a PRP, and directed the Office of the Attorney General to submit a transfer order. The trial court signed the transfer order on November 2, 2023. In March 2024, the Acting Chief Judge of this division issued an order referring the petition to a panel and appointing counsel.

That same month, Canter's supervision was transferred to Watt. Watt allowed Canter to turn off monitoring for the VA and Navy Federal Credit Union (NFCU) applications on his phone. In September, Canter's supervision was again transferred, this time to CCO Johnathan Ng. In December, DOC sought and was granted leave to supplement the record with a declaration from Ng, which Canter did not oppose. Ng's declaration stated that Canter had contacted him on

November 25, asking for permission to use social media and video conferencing and Ng had granted Canter's request.

In March 2025, DOC brought a second motion to supplement the record with another declaration from Ng, which Canter joined and this court granted.[10] Ng's second declaration asserted that he had approved further changes to Canter's monitoring and detailed them. Ng explained that he had permitted Canter to change A2U's monitoring setting from "Everything" to "Alerts," with the caveat that Ng could require Canter to revert this change if Ng was "investigating supervision violations." Ng also declared that he told Canter that in order to ensure that attorney-client communications were excluded from monitoring, Canter should add the attorney's name and e-mail as new trigger words in A2U and then set those words to "Ignore." Ng's stated understanding at the time of the declaration was that this would mean "[A2U] will not send [Ng] any alerts on activity records containing the attorney's name and email address." Ng claimed that Canter had confirmed that he had done so.

Canter moved to supplement the record the day before oral argument in this court. The material Canter wished to have this court consider included a declaration from his appellate counsel, who explained that after Ng had instructed Canter to add her e-mail address to A2U's list of excluded trigger words, she followed up with A2U to inquire about the effectiveness of this measure. She asserted that in response to her query, A2U confirmed that there was no way to completely exclude her privileged communications with Canter from monitoring.

---

[10] Prior to oral argument, the Clerk of this court entered a ruling at the direction of the panel granting this motion to supplement.

DOC did not object to Canter's motion to supplement and the panel granted his motion at oral argument.[11]

ANALYSIS

I.      Standard of Review for PRPs

To prevail on a PRP, the petitioner must prove that they are currently restrained and the restraint is unlawful. *In re Pers. Restraint of Blackburn*, 168 Wn.2d 881, 883-84, 232 P.3d 1091 (2010); RAP 16.4(a)-(c). As relevant here, a showing of restraint requires proving that the petitioner has limited freedom due to a judgment in a criminal case. RAP 16.4(b). A person subject to conditions imposed by the ISRB is restrained within the meaning of RAP 16.4. *See In re Pers. Restraint of Winton*, 196 Wn.2d 270, 274-75, 474 P.3d 532 (2020). Canter is restrained by the ISRB conditions he now challenges, which limit his freedom to access and communicate via the Internet as a result of his criminal conviction, and the manner by which DOC has chosen to enforce them. *See In re Pers. Restraint of Ansell*, 1 Wn.3d 882, 892, 533 P.3d 875 (2023) (plurality opinion).

The petitioner carries the burden in a PRP to prove by a preponderance of the evidence that they are entitled to relief. *In re Pers. Restraint of Frazier*, 4 Wn.3d 1, 26, 558 P.3d 451 (2024). In order to obtain relief, Canter must establish that his restraint by way of the ISRB conditions and DOC enforcement thereof is unlawful. The restraint is unlawful if it is "in violation of the Constitution of the United States or the Constitution or laws of the State of Washington." RAP 16.4(c)(6); *see also*

---

[11] Wash. Ct. of Appeals oral arg., *In re Pers. Restraint of Canter,* No. 85969-2-I (Apr. 22, 2025), at 0 min., 34 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025041402/.

*Winton*, 196 Wn.2d at 277 ([T]he imposition of an unconstitutional condition would be manifestly unreasonable.").

Conditions imposed by the ISRB are reviewed for abuse of discretion; "[i]mposition of an unconstitutional condition is manifestly unreasonable." *Ansell*, 1 Wn.3d at 892. Recently, in *State v. Johnson*, our State Supreme Court recognized the role of individual CCOs in the specifics of the enforcement of community custody conditions and appeared to suggest that CCO decisions are also subject to the same constitutional limitations as the ISRB or DOC's imposition of those conditions. 197 Wn.2d 740, 745-49, 487 P.3d 893 (2021). It stands to reason, then, that DOC enforcement decisions are subject to the same abuse of discretion standard.

II.    Mootness

As a threshold matter, we acknowledge the various modifications Ng authorized with regard to his monitoring of Canter's Internet activity and first consider whether they have mooted Canter's PRP. A petition is moot "if we can no longer provide effective relief." *In re Pers. Restraint of Blaylock*, 30 Wn. App. 2d 569, 577, 546 P.3d 86 (2024). However, we may review an issue that is otherwise moot if it satisfies an exception to the mootness doctrine. One such exception is "if the issue involves [a] continuing and substantial public interest." *Id.* This court has previously explained that

> Washington courts consider three factors when determining whether a case presents an issue of continuing and substantial public interest: (1) whether the issue is of a public or private nature, (2) whether an authoritative determination is desirable to provide

- 10 -

future guidance to public officers, and (3) whether the issue is likely to recur.

*State v. Gelinas*, 15 Wn. App. 2d 484, 488, 478 P.3d 638 (2020). In his supplemental brief, Canter persuasively argues that "[t]his [c]ourt and the Supreme Court have repeatedly held that the proper interpretation of statutes and rules governing the supervised release of sex offenders are matters of substantial public interest." He further notes that the ISRB "and DOC regularly impose [I]nternet-monitoring conditions on community custody supervisees whose offenses involved social media."

The ISRB offers no response to Canter's preemptive arguments regarding mootness. Because A2U remains on Canter's devices and is continuing to collect data, including his constitutionally-protected communications with counsel that the trial court explicitly warned could not be intercepted, the issues presented are not moot, and we are able to provide effective relief should Canter carry his burden in this PRP. Accordingly, we need not address the public interest exception factors and instead proceed to the merits.

III.     Constitutionality of DOC Enforcement of Internet-Related Conditions

The ISRB has statutory authority to impose additional community custody conditions "based upon the crime of conviction, risk of reoffense, or risk to community safety." RCW 9.95.420(2). However, any ISRB modifications or conditions imposed in addition to those ordered by the court may not be "contrary to those ordered by the court and may not contravene or decrease court-imposed conditions." RCW 9.94A.704(10)(b). Further, the ISRB "must consider and may

impose [DOC]-recommended conditions." *Id.* DOC is required to monitor supervisees convicted of sex offenses to ensure compliance with the conditions imposed on them and for any potential violations. RCW 9.94A.507(5).

However, the respective authority of the ISRB and DOC is not without limitation. Our Supreme Court has explained that "[c]onditions that interfere with fundamental rights must be reasonably necessary to accomplish the essential needs of the State and public order" and "must be sensitively imposed." *State v. Warren*, 165 Wn.2d 17, 32, 195 P.3d 940 (2008). While our state's highest court was specifically addressing general sentencing conditions from the trial court in *Warren*, it subsequently explained in *Winton*, 196 Wn.2d at 277, that though such conditions "are distinguishable in some aspects," it had later applied a similar analysis to community custody conditions in *State v. Bahl*.[12] More critically here, *Winton* plainly declared that "the same reasoning [from *Bahl* and *State v. Nguyen*[13]] applies . . . to community custody conditions imposed by the ISRB." *Winton*, 196 Wn.2d at 277-78. The ISRB abuses its discretion if it imposes conditions impacting fundamental rights that are not "sensitively imposed" or narrowly tailored. *Id.*

Canter's overarching claim is that the ISRB, through DOC, has failed, in its efforts to monitor imposed conditions, to comply with statutory and constitutional requirements to "narrowly tailor any community custody conditions burdening a fundamental right." Toward that end, he presents three distinct federal and state constitutional challenges to the manner by which DOC has elected to monitor the

---

[12] 164 Wn.2d 739, 193 P.3d 678 (2008).
[13] 191 Wn.2d 671, 425 P.3d 847 (2018).

conditions imposed: it unjustifiably infringes on his right to privacy under the Fourth Amendment to the United States Constitution and article I, section 7 of our state constitution; it chills or precludes his right to free speech under the First Amendment to the United States Constitution; and the boundaries of his supervision are too vague to provide proper notice of prohibited conduct in violation of his right to due process pursuant to the Fourteenth Amendment to the United States Constitution.

A.      Right To Privacy

The Constitution of the United States protects against unreasonable search and seizure. *See* U.S. CONST. amend. IV. Our state constitution enshrines a more protective right to privacy: "[n]o person shall be disturbed in [their] private affairs, or [their] home invaded, without authority of law." WASH. CONST. art. I § 7.

However, for persons subject to supervision by DOC, some degree of infringement of their constitutional rights as part of that monitoring is permissible. *Winton*, 196 Wn.2d at 275; *State v. Balles*, 32 Wn. App. 2d 356, 365, 556 P.3d 698 (2024) (explaining supervisees "do not enjoy the same constitutional privacy protections as other citizens"), *aff'd,* __ Wn.3d __, 572 P.3d 1186 (2025). "Washington courts have specifically recognized the reduced privacy interests of sex offenders due to the threat they pose to public safety." *In re Det. of Lee*, 14 Wn. App. 2d 271, 294, 471 P.3d 915 (2020).

DOC may limit a supervisee's right to privacy only insofar as required by the supervision process. *Id.* at 293-94. DOC must still narrowly tailor restrictions on a supervisee's Internet access based on the risks presented by that specific

supervisee. *See Johnson*, 197 Wn.2d at 745. More generally, the United States Supreme Court has held that government restrictions on access to the Internet, particularly social media, "must be 'narrowly tailored to serve a significant government interest.'" *Packingham v. North Carolina*, 582 U.S. 98, 105-08 (2017) (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)).

### 1. A2U Monitoring Is a Constant Suspicionless Search

Individuals subject to government supervision, like community custody, are "not entitled to the full protection of article I, section 7" of the state constitution. *State v. Cornwell*, 190 Wn.2d 296, 301, 412 P.3d 1265 (2018). A CCO does not need a warrant to conduct a search of a supervisee, including searches of electronic devices; reasonable suspicion will suffice. *Id.* at 302; *see also* RCW 9.94A.631(1). However, the law "permits a warrantless search of the property of an individual on probation *only* where there is a nexus between the property searched and the alleged probation violation." *Id.* at 306 (emphasis added).[14] Our Supreme Court has explained that the nexus is required because to allow otherwise would subject supervisees to searches that could be "used as 'a fishing expedition to discover evidence of other crimes, past or present.'" *Id.* at 304 (internal quotation marks omitted) (quoting *State v. Olsen*, 189 Wn.2d 118, 134, 399 P.3d 1141 (2017)). It further held that a supervisee's privacy rights may be lessened "'only to the extent necessitated by the legitimate demands of the

---

[14] While the court in *Cornwell* at times used the term "probation," the facts of that case establish that Cornwell had been ordered to report to DOC for supervision, which is community custody. 190 Wn.2d at 298.

operation of the [community supervision] process.'" *Id.* at 303-04 (alteration in original) (internal quotation marks omitted) (quoting *Olsen*, 189 Wn.2d at 125).

Canter was convicted of sex offenses and will be on community custody and under the authority of the ISRB for the remainder of his life. Nonetheless, he enjoys a right to privacy that may be reduced only to the extent necessary to ensure compliance with the conditions imposed by the ISRB. Canter's offense was facilitated by the use of the Internet, which means the interest of public safety requires some degree of Internet monitoring. However, the A2U monitoring software as initially configured by DOC was overly invasive and enabled suspicionless searches that far exceeded the bounds identified by our State Supreme Court in *Cornwell*.

The facts underlying Canter's crimes of conviction do not require monitoring of his financial information, medical information, or communications with his attorney, particularly given that the latter two categories of information are subject to separate statutory and constitutional protections. The ISRB does not appear to suggest it is entitled to such private information, but it does not provide any rule or internal policy that would prevent individual CCOs from accessing these sorts of protected information through A2U.

DOC did not initially offer any articulable standard, such as reasonable suspicion of a violation of Canter's conditions of release, to justify its access to Canter's otherwise private information either. In fact, Young, Canter's CCO at the time of his release onto community custody, required the "Everything" setting be enabled within A2U, as did his next CCO, Watt. However, even though Ng allowed

Canter to limit the setting to "Alerts," according to A2U, that simply means that the CCO would only receive reports flagging potentially problematic activity. It does not mean that the system ceases monitoring all of Canter's Internet activity, including that involving clearly protected health information, personal financial information, and privileged attorney-client communication. That is the problem we must resolve: whether the continuous monitoring and potential for viewing by the CCO infringes on even the reduced rights of a supervisee, particularly where there is no DOC policy constraining CCO determinations about what level of oversight they may require.

At oral argument before this court, DOC contended, and Canter did not dispute, that only Canter can revert the monitoring from "Alerts" to "Everything."[15] That is, only the person in control of the device may change the level of monitoring; the CCO does not have remote access to each device through A2U. DOC further asserted that if Ng has reasonable suspicion to conduct a search, part of his investigation will include directing Canter to revert to "Everything" monitoring, so the CCO can view the potential violation.[16] However, these contentions have no impact on the matter of perpetual suspicionless searches by way of A2U's constant monitoring of Canter's electronic communications.

2.    A2U Captures Protected Privileged Communications

As initially configured, the CCO's monitoring of Canter's Internet activity included the ability to view confidential health and financial information, as well as

---

[15] Wash. Ct. of Appeals oral arg., *supra*, at 12 min., 50 sec.
[16] *Id.* at 13 min., 43 sec.

intercept privileged communication with his attorney. Canter stated that this included his communications with the VA regarding his treatment for posttraumatic stress disorder and his use of banking and stock trading applications. While that particular issue has been remedied by Ng's permission to exclude the relevant applications on Canter's device, here the VA and NFCU, this does not address the broader question of whether the collection of this information by A2U, or any other similar program, and viewing of the information by the CCO satisfies the narrow tailoring requirement when conditions of confinement or supervision impact a fundamental right.

"The fact of admission to a provider for mental health services and all information and records compiled, obtained, or maintained in the course of providing mental health services to either voluntary or involuntary recipients of services at public or private agencies may not be disclosed except as provided" by law. RCW 70.02.230(1). Federal law also limits the disclosure of protected health information. *See* 45 C.F.R. § 164.512. The ISRB and DOC appear to agree that nothing about the circumstances of Canter's crime necessitated monitoring his health or financial information and no later events, such as purported violations of the terms of his supervision, justified the invasion into such sensitive and confidential matters. More critically, the level of intrusion into these protected aspects of a supervisee's life appears to rest on the discretion of individual CCOs. Young required a setting that provided her with reports that included surveillance of private information wholly unrelated to the crime of conviction, but Canter successfully convinced Watts and later Ng to approve exemption of certain

applications. Nonetheless, the ISRB appears to argue that reliance on each CCO to engage in the narrow tailoring required by the federal and state constitutions is sufficient.

The same is effectively true as to Canter's privileged communications with counsel as, at present, it remains unclear the degree to which those interactions are protected from intrusions by CCOs via A2U monitoring. Ng advised Canter on how to make it *less likely* that his communications with counsel would be flagged by A2U, but based on Canter's appellate counsel's declaration to this court, it seems that this method is not infallible and, even if it were, those communications are ultimately still available and accessible by the CCO through A2U.

The right to counsel is enshrined in our nation's constitution. *See* U.S. CONST. amend. VI. This necessarily "includes the right to confer privately with that counsel." *State v. Myers*, 27 Wn. App. 2d 798, 804, 533 P.3d 451 (quoting *State v. Peña Fuentes*, 179 Wn.2d 808, 811, 318 P.3d 257 (2014)), *review denied,* 2 Wn.3d 1010 (2023). The right "is violated when the State intrudes into a privileged attorney-client communication." *State v. Irby*, 3 Wn. App. 2d 247, 254, 415 P.3d 611 (2018). We have made clear that each government interception of privileged attorney-client communications represents a separate violation of this protected right. *See Myers*, 27 Wn. App. 2d at 808-09, 816-18. Canter has not separately challenged CCO intrusions into communications with counsel, but, absent a DOC policy to avoid infringement on this fundamental right, there is a significant risk of repeated constitutional violations, with Canter or other supervisees. The efficacy of the steps recommended by Ng remains unclear, and the lack of a formal DOC

policy to prevent future trespass underscores the problems with the current monitoring software and supervision protocols.

B.     Right To Free Speech

Canter next contends that the use of A2U by DOC to ensure compliance with his conditions of community custody creates a "chilling effect" on his rights under the First Amendment and by "excluding text [messages] and e[-]mails from its monitoring and limiting the rest of the monitoring to 'Alerts' only, DOC can mitigate these First Amendment concerns." He also avers that Young's prohibition of his use of social media ran afoul of *Packingham* but acknowledges that this particular prohibition was recently removed by Ng.

DOC does not substantively engage with Canter's First Amendment concerns in its supplemental brief but did address the issue in a statement of additional authorities proffered in late March 2025 pursuant to RAP 10.8. Therein, DOC offered a case regarding monitoring of controlled substance use and then broadly asserted that the *Internet* monitoring at issue here does not violate the First Amendment because it is narrowly tailored to reflect the circumstances of Canter's crime, the State's interest in the protection of children, and the needs of Canter's CCOs to have effective tools for achieving that stated goal.

Canter further notes that our State Supreme Court predicted this precise issue in *Johnson* when it acknowledged that "[w]hile requiring [the use of] an overzealous filter might violate the First Amendment, that is a question of appropriate enforcement and question for another day." 197 Wn.2d at 746-47.

###### 1.    Government Infringement on Free Speech by A2U Monitoring of Text and E-mail Communications

The First Amendment provides in relevant part that "Congress shall make no law . . . abridging the freedom of speech."  Our nation's highest court has interpreted our right to free speech as protecting a vast array of activities, including refraining from speech or engaging in symbolic and commercial speech.  *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) (freedom from compelled speech); *United States v. Eichman*, 496 U.S. 310 (1990) (freedom to engage in symbolic speech); *Nat'l Ass'n for Advancement of Colored People v. Claiborne Hardware Co.,* 458 U.S. 886 (1982) (freedom to engage in boycotts).  Further, the jurisprudential limitations on government restrictions of this core right exceed well beyond the congressional law-making specifically referenced in the text of the First Amendment.  One particularly relevant example, analyzed further in Section III.B.2 *infra*, comes from the United States Supreme Court, which specifically held that our right to free speech also protects access to the places where that speech occurs and recognized that among "the most important places" this speech takes place "is cyberspace—the 'vast democratic forums of the Internet.'"  *Packingham*, 582 U.S. at 104 (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 868 (1997)).

The speech implications of DOC's constant monitoring of Canter's text messages and e-mails through A2U are clear: his private financial transactions are monitored, privileged communication with health care providers and his attorney are captured and scanned for "trigger words," and any discussions with friends, loved ones, or colleagues about myriad private or sensitive topics far beyond the

scope of the conduct underlying Canter's crimes of conviction are analyzed and recorded in the event that a CCO finds a reason to review them. It is hard to imagine a more chilling effect than having nearly every word one may type into a device collected by the government for possible future examination.

At oral argument before this court, DOC justified the suspicionless monitoring of Canter's text messages and e-mails as "crime-related."[17] However, as Canter correctly noted, the connection between his crimes of conviction and these modes of communication is too common to support such unfettered scrutiny.[18] The interaction between law enforcement and Canter that led to his arrest began on Craigslist and only later moved to text messages and Canter's private e-mail. If Canter's CCO should become aware that he has attempted to contact potential victims by Craigslist or traditional social media, the CCO would then have reasonable suspicion to intrude into Canter's electronic communications to search for evidence of a violation. But absent that reasonable suspicion, broad routine intrusions on a cornerstone of modern communication cannot meet the constitutional requirement of narrow tailoring to the circumstances of Canter's crime.

### 2. Government Infringement on Free Speech by Banning Social Media Use

Again, a community custody condition may restrict a supervisee's First Amendment rights, but that restriction must be narrowly tailored, sensitively imposed, and "'reasonably necessary to accomplish the essential needs of the

---

[17] Wash. Ct. of Appeals oral arg., *supra*, at 18 min., 51 sec.
[18] *Id.* at 8 min., 20 sec.

state and public order.'" *Bahl*, 164 Wn.2d at 757 (internal quotation marks omitted) (quoting *State v. Riley,* 121 Wn.2d 22, 37-38, 846 P.2d 1365 (1993)). While the free speech implications of the social media ban Young imposed on Canter may not be as immediately apparent as those arising from constant seizure and scanning of his e-mails and text messages, they are nonetheless significant. In *Packingham*, the Supreme Court explicitly noted that "[s]ocial media offers 'relatively unlimited, low-cost capacity for communication of all kinds'" and its users "employ these websites to engage in a wide variety of protected First Amendment activities on topics 'as diverse as human thought.'" 582 U.S. at 104-05 (quoting *Reno v. Am. Civil Liberties Union,* 521 U.S. at 870). It further held that total prohibitions on the use of social media, without some degree of tailoring, will be found unconstitutional. *Id.* at 105-08.

Before the trial court and in the instant petition, Canter alleged that Young had interpreted the sentencing court's condition that prohibited his use of chat rooms to be a general restriction on the use of social media. Given that A2U allows for CCOs to ensure that Canter is not engaging in any inappropriate interactions on social media, this blanket prohibition imposed by DOC violated the constitutional requirement for narrow tailoring. The ban was not "reasonably necessary" to carry out DOC's objective, which could have been achieved through less restrictive means, including simply relying on the monitoring of Canter's communication on social media by A2U for inappropriate interactions. Thus, Young's implementation of such a broad restriction plainly constituted an abuse of discretion as DOC failed to demonstrate any compliance with the constitutional

mandate for narrow tailoring, or sensitive imposition, as set out in binding federal and state authority. *See Packingham*, 582 U.S. at 105-08; *Winton*, 196 Wn.2d at 277*, Johnson*, 197 Wn.2d at 745, *Olsen,* 189 Wn.2d at 127-28; *State v. Padilla*, 190 Wn.2d 672, 678, 416 P.3d 712 (2018); *Ansell*, 1 Wn.3d at 923 (McCloud, J., concurring in part).

As noted herein, and as DOC conceded at oral argument before this court, Canter did not attempt to find victims via traditional social media.[19] DOC tries to explain away Young's complete prohibition on social media use as a means of effectuating the conditions imposed by the trial court and the ISRB and also asserts that it can find no evidence of Young's bar on such access. However, documentation Canter provided that demonstrates his continued efforts to be allowed social media access strongly suggests that Young did broadly interpret the condition in the manner Canter alleges. Further, Canter notes that Young's declaration to the trial court did not deny his allegations on this issue.

Ng's recent decision to reduce the scope of incursions into Canter's right to free speech now satisfies some of the requirements regarding narrow tailoring. Canter took great care at oral argument before this court to recognize and express gratitude to both Ng, and by extension DOC, for these significant improvements that bring the government closer to compliance with these constitutional mandates.[20] The parties agree that Canter is currently permitted to use social media for business, personal enrichment, and everyday social interactions, so long as he otherwise complies with the conditions of his release. Canter's social media

---

[19] Wash. Ct. of Appeals oral arg., *supra*, at 19 min., 3 sec.
[20] *Id.* at 6 min., 50 sec.

access does not conflict with the State's interest in protecting potential child victims from him. Ng's declarations to this court establish that he will receive alerts from A2U if Canter engages in any potentially problematic interactions online and will have the ability to conduct a more invasive search, including text messages and e-mails, if he has reasonable suspicion to believe that Canter has violated the terms of his custody. Thus, the *present* manner of enforcement of the conditions by DOC is constitutional, but absent a formal policy to establish clear guidelines that comport with these constitutional mandates, Canter's experience of arbitrary interpretation of conditions in violation of constitutional protections that shift upon reassignment to a new CCO will likely be repeated with other supervisees also subject to Internet monitoring conditions.

C.     Vagueness and Right To Due Process

Finally, Canter asserts that the social media ban and enforcement of the Internet monitoring condition violate his right to due process because they are unconstitutionally vague. These allegations stem from the insistence of his past CCOs that they have "Everything" access, rather than simply "Alerts," and the total prohibition on the use of social media. Again, both of these conditions have since been modified by Ng. Canter accurately notes that the responsive briefing from DOC does not engage with his due process argument or otherwise analyze the issues presented in his case under the applicable constitutional standard.

The Fourteenth Amendment declares in relevant part that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." Our State Supreme Court has long recognized that vagueness challenges

implicate due process under both the federal and state constitutions.  *See, e.g., Bahl*, 164 Wn.2d at 752; *City of Spokane v. Douglass*, 115 Wn.2d 171, 178, 795 P.2d 693 (1990); *State v. Maciolek*, 101 Wn.2d 259, 264, 676 P.2d 996 (1984); *City of Seattle v. Pullman*, 82 Wn.2d 794, 795, 514 P.2d 1059 (1973).

Our Supreme Court has identified several "overarching instances when a court will declare a legal provision, such as a community custody condition, unconstitutionally vague."  *Padilla*, 190 Wn.2d at 679.  A condition must provide a "'person of ordinary intelligence a reasonable opportunity to know what [behavior] is prohibited.'"  *Id.* (alteration in original) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).  Next, the condition must have "explicit standards" to prevent "'arbitrary and discriminatory'" enforcement by the supervising CCO.  *Id.* (quoting *Grayned*, 408 U.S. at 108).  Finally, a vague condition that "encroaches on 'sensitive areas of basic First Amendment freedoms' naturally inhibits the exercise of those freedoms because individuals who are uncertain of the meaning of a [condition] will steer 'far wider' than necessary in order to ensure compliance."  *Id.* (internal quotation marks omitted) (quoting *Grayned*, 408 U.S. at 109).

The outright ban on social media use initially imposed on Canter clearly implicates one of the instances identified in *Padilla* where a condition fails to provide the "explicit standards" required to prevent precisely the arbitrary enforcement Canter experienced as his supervision passed among three different CCOs.  Young and Watt maintained the ban, despite the trial court's clarification that its prohibition on the use of chat rooms did not include social media, and Ng exercised his discretion in a completely distinct manner by lifting it.

Separately, Canter asserts that the Internet monitoring conditions also fail as unconstitutionally vague because of arbitrary enforcement. The materials appended to his petition establish the extent of his efforts to understand the contours of the A2U monitoring, both as to its ability to run on the operating systems of different devices and the reasoning behind requiring "Everything" access instead of "Alerts." For example, when he contacted DOC by letter after the trial court clarified its conditions in his J&S, ISRB Hearing Investigator Monika Fields began her e-mail response to him with, "I feel like we have been over this numerous times already" and, as to its screening of his text messages and e-mails, simply answered that "[e-]mails and texts are often monitored for sexually explicit material, and [A2U] screens for trigger words." At oral argument before this court, counsel for DOC acknowledged that, at least to a certain degree, its use of the A2U "Everything" setting relies on some level of trust that the CCO will not access the online detail reports to review the content of the supervisee's e-mails or text messages without reasonable suspicion of a community custody violation.[21] DOC apparently fails to appreciate, however, that it is precisely that reliance on "trust," rather than explicit policy guidelines, that renders the current Internet monitoring scheme vulnerable to arbitrary enforcement as demonstrated by the highly subjective discretionary decisions of Canter's various CCOs with regard to the degree of A2U monitoring to which he was subject. Further, Canter has also provided A2U detail reports and correspondence between the software company and his appellate counsel that establish innocent communications unrelated to any

---

[21] Wash. Ct. of Appeals oral arg., *supra*, at 17 min., 45 sec.

risk of reoffense will trigger an alert to his CCO, no different than if he engaged in conduct identical to that underlying his convictions in this case.[22]

> D. Agency Guidance Required to Satisfy Narrow-Tailoring Requirement and Prevent Arbitrary or Capricious Enforcement

The facts of Canter's history of supervision highlight the necessity for DOC to develop clear guidance for CCOs on the use of A2U, or any similar program, to monitor Internet conditions imposed on supervisees convicted of sex offenses. While we recognize the practical need to defer to the CCOs the interpretation of certain conditions and determination of how to best monitor compliance, unfettered discretion can, as it did here, run afoul of the constitutional protections supervisees still enjoy even after conviction and while under a degree of control by the State. Arbitrary enforcement of conditions as occurred here violates the due process rights of supervisees.

Separately, the A2U "Everything" setting, when used as a baseline of supervision, does not comply with the constitutional requirements for narrow tailoring due to the infringement on the fundamental rights of the supervisee. Perhaps more critically, DOC must wrestle with the fact that A2U, and likely other comparable programs, engage in the perpetual capture of electronic communications *by design* even when placed in the "Alerts" setting and each of those interceptions is no less a governmental intrusion on the free speech of the

---

[22] In one of many examples Canter provided, A2U issued an alert based on e-mails with his court-mandated sexual deviancy treatment provider, whose signature block contained the words "Sex Offense Treatment and Assessment Programs, Washington State Department of Corrections." A2U presumably created a "Questionable Activity Report" based on the word "sex" in the name of the DOC program listed in the therapist's signature block.

person subject to supervision than any other suspicionless search. But, the answer to the precise question presented by Canter's PRP is clear: allowing a CCO absolute discretion to view A2U's suspicionless searches is a constitutional violation.

Canter has carried his burden to demonstrate that his restraint is unlawful because CCOs have unfettered discretion to view the data collected by A2U's suspicionless searches of Canter's communications through its constant acquisition and review of his text messages and e-mails in violation of the constitutional protections addressed herein. Accordingly, the methods employed by DOC to monitor the community custody conditions regarding Internet use and communication are not narrowly tailored, and we grant Canter's petition.

WE CONCUR: